T.C. Memo. 2003-189


UNITED STATES TAX COURT


ESTATE OF CHARLES N. ARONSON, DECEASED, BARNEY P. ARONSON,
EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5873-01.                       Filed June 30, 2003.


Roger B. Simon, for petitioner.

Jennifer S. McGinty, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


VASQUEZ, Judge: Respondent determined a deficiency of $2,224,224.71 in the Federal estate tax of the Estate of Charles N. Aronson (decedent). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death.

The sole issue for decision is whether an interest in the trust created by decedent's will qualifies for the estate tax marital deduction as "qualified terminable interest property" (QTIP), within the meaning of section 2056(b)(7).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

At the time of his death on December 20, 1996, decedent resided in Cattaraugus County, New York. At the time of decedent's death, decedent and Josephine R. Aronson (Jo) were married--and had been married 61 years--and they were U.S. citizens and residents. Decedent was survived by, among others, (1) Jo, (2) Barney R. Aronson (Barney), who is Jo's son and decedent's adopted son, and (3) Barney P. Aronson (Bar), who is Barney's son and decedent's grandson.

Bar is the executor of decedent's estate. At the time the petition was filed, Bar resided in Arcade, New York.

Decedent was born in 1913 near Lincoln, Nebraska. Decedent was a knowledgeable businessman. Decedent founded and ran Aronson Machine Co. He retired in 1969.

Decedent was a strong-willed, "bullheaded" man. He was self made, and, even though he had only a high school education, he

"felt superior to everyone else".  In general, decedent "disliked attorneys".  He felt attorneys "were out to get his money".

At the time decedent died, Bar and decedent lived at 11520 Bixby Hill Road, Arcade, New York (Hundred Acres).[1]  There were two houses on Hundred Acres.  Decedent and Jo lived in "the Big House", and Bar and his wife, Charlene Voit Aronson (Charlene), lived in "the Little House".  While living on Hundred Acres, Bar took care of decedent, Jo, and Hundred Acres.

Bar was responsible for maintaining Hundred Acres.  Decedent met with Bar once a week to discuss the maintenance of Hundred Acres, to inform Bar of anything that required attention, and to chastise Bar if he did not get things done in a timely fashion.  Decedent had conversations with Bar regarding estate taxes and Jo's income.  Decedent, however, never discussed leaving a QTIP to Jo.

On May 31, 1980, decedent executed a will (1980 will).  The 1980 will revoked all prior wills and codicils.  In the first article of the 1980 will, decedent gave all of his personal effects, household effects, motor vehicles, works of art, and tangible personal property to Jo.  The 1980 will also provided:

> SECOND:  If my wife survives me, I hereby create a marital trust.  There shall be allocated to the marital trust that amount (if any) which, when added to any other sums allowable in determining the marital

---

[1]  Around 1981, Bar had moved into the Little House on Hundred Acres.

deduction in the federal estate tax proceeding relating to my estate, shall equal the maximum marital deduction allowable in such proceeding. Notwithstanding the foregoing, such amount shall not exceed that minimum sum which, when added to such other sums, will have the effect of reducing to zero the federal estate tax (after giving effect to all credits against tax) determined in such proceeding. The marital trust (which is an amount and not a fractional share) shall be established with cash or any other assets qualifying for the marital deduction, first preference to be given to assets not subject under the Internal Revenue Code to a credit for foreign death taxes. All assets allocated to the marital trust shall be valued as of their respective dates of distribution. The marital trust shall be held upon the following terms:

A. The entire net income of the marital trust shall be paid to my wife, JOSEPHINE R. ARONSON, at least quarter-annually during her lifetime.

\* \* \* \* \* \* \*

THIRD: If my wife survives me, I give all the rest of my property, real and personal, wherever situated, herein called my residuary estate, to my Trustee to hold as a family trust upon the following terms:

A. The entire net income of the family trust shall be paid to my wife, JOSEPHINE R. ARONSON, at least quarter-annually during her lifetime.

\* \* \* \* \* \* \*

FIFTH: As my wife and I in no way want to try to impose the will of the dead hand, it will be up to our heirs to determine who lives in the Big House and the Little House on Hundred Acres. It is our wish that Hundred Acres will always belong to Aronsons, that an Aronson live in the Big House, and that Charles J. Aronson have the use of the Little House as long as he wishes. It is also our wish that our heirs see to it that the property taxes and utility bills are paid so that the Big House will be kept from freezing up or passing from Aronsons through tax default.

On February 25, 1982, decedent executed a new will (1982 will). The 1982 will revoked all prior wills and codicils. The 1982 will was virtually identical to the 1980 will, except, in pertinent part, the fifth article of the 1982 will provided that Bar, instead of Charles J. Aronson, should have use of the Little House.

The 1980 will and the 1982 will were drawn by a law firm in Buffalo, New York. Decedent remarked that his experience with this law firm was "less than successful", and he eventually fired those attorneys.

Robert C. Newman has been an attorney since 1981. He first met with decedent in February 1988 after decedent contacted him via a letter dated February 6, 1988. Decedent contacted Mr. Newman because decedent knew Mr. Newman's parents and decedent was dissatisfied with his then-current attorneys at the law firm in Buffalo, New York.[2] Most of decedent's communications with Mr. Newman, and vice versa, were in writing.

At first, Mr. Newman thought decedent was seeking tax advice; however, it quickly became clear to Mr. Newman that decedent did what decedent wanted to do. Furthermore, decedent stated to Mr. Newman that he (decedent) would rather pay estate taxes than draw up his will in a way other than what he wanted.

---

[2] Additionally, because decedent and Jo were recluses, decedent wanted someone close by who could come to Hundred Acres.

Decedent received financial and tax advice from C.P.A.s at the accounting firm of Seidman & Seidman. Mr. Newman never had any contact with accountants at Seidman & Seidman.

Decedent prepared a will dated February 6, 1988 (1988 proposed will). Decedent mailed a copy of the 1988 proposed will to Mr. Newman. In the letter to Mr. Newman accompanying the 1988 proposed will, decedent informed Mr. Newman that it was a serious mistake to underestimate his abilities and that what he wanted was an attorney who could sign the following statement: "I have closely examined this Will and have found it to be a legal document that should have no difficulty in probate."[3] Decedent would have considered changes to the 1988 proposed will if it had meant Mr. Newman would sign the aforementioned statement. Decedent, however, was "not looking for any changes at all, frankly, but if there is a glaring error, we'll want that corrected." Decedent also wrote: "I do not expect you to know everything but I do expect you to know where to find out whatever we need to know to do the job better than it has ever been done before."

The 1988 proposed will revoked all former wills and codicils and provided, in relevant parts, as follows:

---

[3] Decedent included this language at the end of the 1988 proposed will along with a space underneath it for Mr. Newman to sign.

FIRST: I hereby create a Trust and give into it all my personal effects, household effects, motor vehicles, works of art, and other tangible personal property, all my stocks and bonds, my personal checking account, such to be held secure for equal division among Jo's biologic descendants if she survive[s] me and if so, Jo is to receive all the dividend and interest income from such assets as long as she lives, and upon her death the real property known as Hundred Acres and the buildings thereon will be added to this Trust, as spelled out in Jo's Will, and this Trust will then be liquidated and the proceeds divided equally among Jo's biologic descendants as administered by the two Executors, Barney R. Aronson and Barney P. Aronson, or if one is dead, the remaining named Executor will name a replacement, and these Executors will have arranged the Trust to be effectuated, at Central Trust Arcade or such as they choose, and the distribution of assets made among Jo's biologic descendants which at this writing are: Barney R. Aronson, Scott Haley Aronson, Charles J. Aronson, Barney P. Aronson, Heather Aronson, Rozlyn Jo Aronson, Jeff Aronson, Charles J. Aronson Jr., or if Jo predeceases me, her Will will have added Hundred Acres to the assets of the Trust and division will proceed as ordered.

* * * * * * *

D. Upon Jo's death, if she survives me, all my estate, now including Hundred Acres, shall be distributed to the eight biologic descendants as named above, or such of them as shall then be surviving, in equal shares, per capita.

* * * * * * *

THIRD. The process of liquidating the assets of my estate, for distribution to the eight biologic descendants as heretofore decreed, may take up to three years after my death, to allow proper advertising, for example, and to avoid flooding the market with art, for instance, and until Hundred Acres has been sold * * *.

Decedent signed the 1988 proposed will, which he prepared, and Jo, Bar, and Charlene signed the 1988 proposed will as witnesses.

On February 19, 1988, decedent wrote a letter to Mr. Newman regarding their meeting on February 18, 1988. Decedent decided that he wanted Mr. Newman to be his attorney. Decedent requested Mr. Newman to inform him, as soon as possible, of "all the subtractions from an estate of approx. $4,000,000". Decedent approved changing the 1988 proposed will to make Bar and Barney executors and trustees. Decedent requested Mr. Newman's "business identification number" so he could fill out "Forms 1099".

On February 22, 1988, decedent wrote a letter to Mr. Newman. Decedent explained that Bar and his wife Charlene had come to live in the Little House on Hundred Acres in the early 1980s to take care of decedent and Jo. Although he felt they were not "worth a damn" the first 3-1/2 years they lived on Hundred Acres, they had "smartened up". Decedent stated that Bar wanted to live on Hundred Acres until he (Bar) died, so Jo and decedent wanted Bar to inherit Hundred Acres, the buildings thereon, and the vehicles and machinery decedent owned "in addition to his being Executor and Trustee and an equal recipient of the residual estate after taxes and expenses." Decedent instructed Mr. Newman to draft his will to reflect this change and to provide him with a copy so he could study the draft, make notes on the draft, and finalize the will.

On February 23, 1988, Mr. Newman wrote a letter to decedent. Mr. Newman acknowledged receiving decedent's letters dated February 19 and 22. Mr. Newman briefly reviewed the 1988 proposed will. Mr. Newman raised one major problem with the 1988 proposed will--some of the witnesses were beneficiaries under the 1988 proposed will and the 1988 proposed will might not be upheld under New York law. Mr. Newman recommended that two "uninvolved" witnesses be used when the new wills were executed. Mr. Newman also informed decedent that he would "have the estate reducing figures and possible tax related suggestions" to decedent soon. Mr. Newman provided decedent with his tax identification number.

On February 25, 1988, decedent wrote a letter to Mr. Newman. Decedent advised Mr. Newman that he (decedent) wrote the 1988 proposed will in order to "cancel" his then-current will drafted by the law firm in Buffalo, New York, and so he could wave it in the law firm's face. Decedent wrote: "I do not pretend to teach anyone Law. But, protected as I am from an avalanche of law books, it is sometimes easier for me to see Justice and Intent than might be true of a lawyer." Decedent continued by "explaining" the law to Mr. Newman. Decedent concluded the letter:

> As I say, I do not want us to get into a debate about Law. Frankly, it is too disgusting a subject for an old man to waste time on. And I wanted mainly to void the Wills MacLeod had, and I think I did just that.

Bob, let's quickly get good, binding,
incontestable Wills affectuated [sic] quickly, or, if
you like, add lines to what I made and bring * * *
legal witnesses and Jo and I will sign again. * * *
dash up to the Big House and we'll make it all legit.
If that will do it for us all. I still want Newmanmade
Wills ASAP.

On March 6, 1988, decedent wrote a letter to Mr. Newman.
Decedent was disappointed in what seemed to him "much too long to
look in the statute books and write to us what the Federal and
State taxes will be, and the fees and commissions as spelled out
by law." Given that at the time he was 75 years old, decedent
wanted his will completed, witnessed, and safely stored in his
"safe room" as quickly as possible.

On March 7, 1988, Mr. Newman wrote a letter to decedent.
Mr. Newman listed the expenses that would be incurred on an
estate of $4 million. Mr. Newman explained that the delay was
not in computing the figures "but rather trying to come up with
an acceptable way of avoiding the estate tax which is quite
significant." Mr. Newman listed the potential Federal estate tax
as $1,302,600 and potential New York estate tax as $392,500. Mr.
Newman wrote that he had "some ideas that I would like you to
examine, but I will present these to you at a later time." Mr.
Newman advised decedent that he had a draft of the will which
would be sent to decedent that Friday for his examination.

On March 8, 1988, decedent wrote a letter to Mr. Newman.  He wrote:

> Yes, the taxes are confiscatory.  I'm not wearing a closed mind about ideas but I do have limitations.  In no way will I ever give up any direct control of my assets.  I have been through a lot of this and it appears to me that any tax saved tends to end up as fees and commissions to the people who "save" me the taxes.

On March 11, 1988, Mr. Newman mailed decedent a copy of a draft will for decedent to review.  Mr. Newman kept as much of the original language, written by decedent, from the 1988 proposed will as possible in the new draft.

On March 14, 1988, decedent wrote a letter to Mr. Newman.  The new draft looked good and right to decedent, and he thanked Mr. Newman for providing him with "information on the costs of dying with property."  Decedent instructed Mr. Newman to come up to the Big House with witnesses as soon as possible so he could execute his new will.

On March 16, 1988, Mr. Newman wrote a letter to decedent.  Mr. Newman enclosed executed proofs of will with the letter.  Mr. Newman recommended that decedent make available to Barney his original adoption papers in order that the new will would withstand challenges.  Mr. Newman also suggested that decedent should destroy his prior wills.

On March 18, 1988, decedent wrote a letter to Mr. Newman.[4] Decedent expressed his satisfaction with Mr. Newman's work. Decedent advised Mr. Newman that no one had the original adoption papers for Barney. Decedent instructed Mr. Newman to obtain copies of the adoption papers.

On March 19, 1988, decedent wrote a letter to Barney and Bar. Decedent expressed a clear understanding of finances and the stock market. Decedent advised Bar and Barney that decedent's C.P.A. was Norman C. Joseph at Seidman & Seidman in Buffalo, New York. Decedent also gave Barney and Bar several instructions including: (1) Bar should have Jo show him (Bar) where her "squirreled-away caches" were; (2) to keep decedent's "custodial account" after he died; (3) to transfer his two "NOW Accounts" to a new "NOW Account" after he died; (4) if in their opinion a property asset had been valued too high, then have Mr. Newman fight it; (5) that Mr. Newman should probate his will and act as the estate's attorney; (6) if they had any questions they should put them in writing and decedent would write another letter to them; (7) to cremate decedent as soon after his death as possible; (8) not to save the ashes from his cremation; (9) there was to be no funeral, ceremony, no viewing of decedent;

---

[4] Although this letter is dated Mar. 18, 1987, it is clear from the testimony at trial, the contents of the letter, and the fact that the letter bears a "received" stamp dated Mar. 21, 1988, that this date is merely a typographical error and the letter was written in 1988.

(10) not to make his death public (no obituary or publicity) and not tell anyone of his death--especially the media; (11) not to obtain a headstone or "stainless steel cross" for decedent to mark his death; (12) the family, and no one else, should gather at the Big House after his death, except grandson Lars who could come only if Jo predeceased decedent--otherwise he was not permitted on Hundred Acres. Decedent directed Bar to use Mr. Newman because decedent trusted Mr. Newman.

On April 7, 1988, Mr. Newman wrote a letter to decedent. Enclosed with the letter were two certified copies of the Order of Adoption of Barney. Mr. Newman also apprised decedent that he had had an additional opportunity to examine the estate tax situation; however, in order to reduce the taxes Mr. Newman advised decedent that he (decedent) was going to have to divest himself of control over his property. Mr. Newman also informed decedent that he could make gifts in the amount of $10,000-per-year to reduce his estate, but "we get back to the same problem that you must give up control. Basically the amount of the tax is the cost of this control."

On April 9, 1988, decedent wrote a letter to Mr. Newman. He thanked Mr. Newman for the copies of Barney's adoption papers. Decedent further wrote:

> Yeah. I know all about $10,000 to a slew of folks, no gift tax and it saves me taxes. I have a one-word response to that and it has only four letters, the first two are n u and the last two are t s. I'm

not saying nuts to you, Bob, but to the idea, which has
been given to me by a lot of folks.

I like your succinctness.  'The only way to reduce
the taxes on my estate is for me to divest myself of
control over the property.'  That same four-letter word
applies here, too.  I've spent 75 years--less a few
years as a crawling baby--working hard, diligently,
totally honestly, in The Golden Rule Way, to acquire
what I have, and if my total wealth is incinerated with
me when I'm dead, that's all right with me, compared to
giving anyone any control at all over what I have
earned.

On May 6, 1988, Mr. Joseph, from Seidman & Seidman, wrote a

letter to decedent.  Mr. Joseph, in response to decedent's

request, informed decedent that the consequences of a tax-free

gift of $10,000 per year would be to reduce decedent's taxable

income and would "serve to reduce your estate and save the very

high estate taxes on each $10,000 that you give away.  The estate

tax rates start at 37% for assets over $600,000."  Mr. Joseph

recommended that decedent make these gifts.

On May 25, 1988, Mr. Joseph wrote another letter to

decedent.  Mr. Joseph further explained the estate and gift tax,

and that the tax rate of 37 percent rapidly accelerated to 55

percent.  Mr. Joseph also informed decedent that in addition to

estate and gift taxes:

we now have a new tax a "generation skipping transfer
tax."  The tax basically is imposed to discourage the
gifting of assets to a second generation below the
transferor.  Thus, it is an attempt to prevent a
grandparent from giving his assets to his grandchild
while leaving his children to enjoy the benefits of

ownership of the property without having the property included in their estates on their death, or when they transfer the property by gift to their children.

On June 1, 1988, decedent wrote a letter to Mr. Newman. Decedent wanted to make a codicil to his will. Decedent decided to make a $10,000 gift each year to Barney, Barney's wife, "Ruth M.", and Bar. Decedent informed Mr. Newman that Mr. Joseph, who decedent identified as his C.P.A., had explained the $10,000-per-year gifts and the tax consequences to him. Bar intended to use the $10,000-per-year gift to help him (Bar) maintain Hundred Acres after decedent died. Decedent, however, felt that the $10,000-per-year gift would not give Bar enough money to maintain Hundred Acres. Decedent decided that the other "heirs" did not deserve equal shares of his estate, so he wanted to change his will to distribute his residuary estate as follows: 25 percent each to Bar and Barney, 10 percent each to two of decedent's other grandchildren, and 7.5 percent each to four of decedent's great-grandchildren. Decedent decided on these amounts because: "As of now, there will be approximately $2,000,000 left after taxes and costs. This is $2,000,000 'residual estate.' Barney and Bar get 25%, or $500,000." Decedent believed that Bar could invest his inheritance in a bond yielding 7 to 8 percent, and this would provide Bar enough money to pay the taxes and upkeep on Hundred Acres.

On June 17, 1988, decedent wrote a letter to Mr. Newman.

Decedent wrote:

> It struck me that Bar's wife Charlene remodeled The Little House and ruined it and when her husband owns Hundred Acres and The Big House she is likely to rip out all the Pittsburgh Twindows and put in sash windows, as she did in the Little House.
>
> I know the implication of 'the dead hand.' BUT. The Big House is more my monument than the Washington Monument is George's . . I designed and built <u>my</u> monument. Charlene would somehow hang lace curtains on the Washington Monument if she could. Or put up awnings where there aren't any windows.

In light of this, decedent wanted his will to include the following language: "No changes or alterations in the Structure or the General Make-up of the Big House on Hundred Acres shall ever be made." Decedent further wrote:

> I know that when I am dead, 'they' can do things to the Big House and I'll never know it. But lying in bed trying to go to sleep at night while I live, and visualizing the horrors that woman can perpetrate on My Monument keeps me awake and in terror. Knowing that my Family Lawyer has made it impossible for any such desecration will be a welcome and effective soporific.

On June 24, 1988, Mr. Newman wrote a letter to decedent. Mr. Newman informed decedent that he had made changes to decedent's will regarding restricting changes to the Big House and the percentage inheritances of the residuary estate. Mr. Newman advised decedent that when the new wills were typed, he would forward them to decedent for him to review.

On June 28, 1988, Mr. Newman mailed decedent a revised draft of decedent's new will for decedent's review and approval.

On July 5, 1988, decedent executed the revised will (July 1988 will).  The July 1988 will revoked all former wills and codicils and provided, in relevant parts, as follows:

> SECOND:  I hereby give, devise and bequeath my real property (which shall include my residence which I refer to as "Hundred Acres" should my wife, Josephine R. Aronson, hereinafter referred to as "Jo," predecease me) my vehicles and machinery to my grandson, BARNEY P. ARONSON.  It is hereby stipulated that no changes or alterations in the structure or the general make-up of the "Big House" on Hundred Acres shall ever be made.

> THIRD:  I hereby create a Trust and give into it all the rest, residue and remainder of my property of every kind and nature and wheresoever situate, such to be held secure for division among "Jo's" biologic descendants as described below, if she survives me, and if so, "Jo" is to receive all the dividends and interest income from such assets as long as she lives, and upon her death this Trust will then be liquidated and the proceeds divided as described below among "Jo's" biologic surviving descendants as administered by the two Executors, Barney R. Aronson and Barney P. Aronson, or if one is dead, the remaining named Executor may name a replacement, and these Executors will have arranged the Trust to be effectuated at Central Trust, Arcade, or such as they choose, and the distribution of assets made as follows:

> 25% of residual estate to my son, BARNEY R. ARONSON;

> 25% of residual estate to my grandson, BARNEY P. ARONSON;

> 10% of residual estate to my grandson, SCOTT HALEY ARONSON;

> 10% of residual estate to my grandson, CHARLES J. ARONSON;

> 7½% of residual estate to my great grandaughter [sic], HEATHER ARONSON;

7½% of residual estate to my great grandaughter [sic], ROSLYN JO ARONSON;

7½% of residual estate to my great grandson, JEFFREY ARONSON; and

7½% of residual estate to my great grandson, CHARLES J. ARONSON, JR.,

or if "Jo" predeceases me division will proceed as ordered above.

On August 9, 1991, decedent executed a new will (1991 will). The 1991 will revoked all former wills and codicils, and it provided for the distribution of the residuary estate as follows: 35 percent to Barney, 35 percent to Bar, 15 percent to Scott Haley Aronson, and 15 percent to Charles J. Aronson. By eliminating his great-grandchildren, decedent also removed the sections of the July 1988 will that dealt with distributions to minors. In all other respects, the 1991 will was essentially identical to the July 1988 will. Decedent did not care whether the estate would be able to claim a marital deduction under the terms of the 1991 will because decedent did not want to relinquish control over his assets.

On March 16, 1993, decedent wrote a letter to Mr. Newman. Decedent wanted a new will. Decedent wanted Bar to inherit Hundred Acres and to be able to earn enough income from his inheritance so that Bar could maintain Hundred Acres. Decedent asked Mr. Newman some questions regarding the generation-skipping transfer (GST) tax, selling his art collection to Bar (in order

to remove the art collection from his estate), and the amount of estate tax on a $5 million taxable estate.  Decedent told Mr. Newman that when decedent had the answers to his questions he (decedent) would prepare a new will.

On April 3, 1993, decedent wrote a letter to Mr. Newman. Decedent understood that there would be GST tax if he made Bar his "sole heir" and that there would be gift taxes associated with giving his art to Bar (so he decided not to do this). Decedent's C.P.A. had given decedent round numbers on what Bar would inherit after taxes.  On the basis of the numbers his C.P.A. provided, decedent felt that Bar would be able to generate enough income from his inheritance after taxes to maintain Hundred Acres, its buildings, and its contents.  Decedent, however, wanted a second opinion from Mr. Newman on how much Bar would inherit after taxes to make sure Bar would have enough to maintain Hundred Acres.  Decedent wanted a new will as soon as possible to ensure that Hundred Acres would not "be lost".

On April 8, 1993, decedent wrote a letter to Mr. Newman. Decedent wrote:  "I'll sure be glad when we have our two Wills finalized so Bar can keep Hundred Acres and the Big House a kind of monument to me.  Instead of a stone in a cemetery."

On April 13, 1993, decedent wrote a document entitled "My Will - An Explanation".  This document is similar to his March 19, 1988, letter to Bar and Barney.  It stated as follows:

I have been an asset to everyone who has been associated with me in any way.  I have been good for the world.  I am more than average.  And I want a more than average monument to my life.  More than a slab in a cemetery.

Aronson Machine Company is <u>not</u> a monument to me. The Big House on Hundred Acres is.  I designed the Big House--invented it--and was its architect and builder. It is unique.  It is my monument.

It is my wish that my monument, the Big House and Hundred Acres, be preserved pretty much as it is as long as possible.  No changes shall be made in the Big House that would alter its true basic concept.

Bar (Barney Peter Aronson) has been my back up and right hand man since April 1982.  I have been training him to manage my estate after my death.  No other family member has done anything for me and my monument.

Therefore, I leave all my worldly goods after Death Taxes to Barney Peter Aronson.

This involves skipping a generation and adds to the tax burden.  My son, Barney Roman Aronson, is only 11 years 9 months younger than I and won't live long enough to preserve my monument very long after my death.  Barney Peter Aronson is 42 years younger than I & can be expected to preserve my monument a long time after my death.

Death Taxes will take so much of my estate that Bar inheriting Hundred Acres will not have enough income to maintain Hundred Acres and the Big House if my estate is divided among several members of the family.

If my estate amounts to $5,500,000 when I die * * * and Bar is my sole heir, he will inherit approximately $2,200,000 including Hundred Acres, building and contents. * * *

* * * * * * *

Thus, to assure preservation of my monument for a fairly long term, Barney Peter Aronson is my sole heir.

On May 10, 1993, Mr. Newman wrote a letter to decedent.  Mr. Newman had redrawn decedent's will, per decedent's request, and enclosed a copy for his review.

On May 12, 1993, decedent wrote a letter to Mr. Newman. Decedent wrote:  "I was trying to show how and why grandson Barney Peter Aronson (let's use his full name instead of his middle initial) would inherit so as to maintain my monument.  The previous Wills--1991--needed to be changed to show one Executor and one inheritor, grandson Barney Peter Aronson."  Decedent enclosed a revised copy of the 1991 will, with alterations decedent made to the language of the 1991 will, as a guide for Mr. Newman.  Decedent instructed Mr. Newman to prepare him a new will, incorporating decedent's changes, and to submit it to him to review.  Decedent's revisions to the 1991 will, in relevant part, were as follows:

> SECOND:  I hereby give, devise and bequeath my real property (which shall include my residence which I refer to as "Hundred Acres" should my wife, JOSEPHINE R. ARONSON, hereinafter referred to as "JO," predecease me), my vehicles and machinery to my grandson, BARNEY P. ARONSON.  It is hereby stipulated that no changes or alterations in the structure or the general make-up of the "Big House" on Hundred Acres shall ever be made.

> THIRD:  I hereby create a Trust and give into it all the rest, residue and remainder of my property of every kind and nature and wheresoever situate, such to be held secure for ~~division among "JO's" biologic descendants as described below~~, if she survives me, and if so, "JO" is to receive ~~all the dividends and interest income from such assets~~ as long as she lives, and upon her death this Trust will then be liquidated and the proceeds ~~divided as described below among~~

~~"JO's" biologic surviving descendants as administered~~
~~by the two Executors, BARNEY R. ARONSON and BARNEY P.~~
~~ARONSON, or if one is dead, the remaining named~~
~~Executor may name a replacement, and these Executors~~
~~will have arranged the Trust to be effectuated at~~
~~Central Trust, Arcade, or such as they choose, and the~~
~~distribution of assets made as follows:~~

~~35% of residual estate to my son, BARNEY R.~~
~~ARONSON;~~

~~35% of residual estate to my grandson, BARNEY P.~~
~~ARONSON;~~

~~15% of residual estate to my grandson, SCOTT HALEY~~
~~ARONSON;~~

~~15% of residual estate to my grandson, CHARLES J.~~
~~ARONSON.~~

The remainder of the third article of the 1991 will had a line
through it and the word "redone" written next to it.  Decedent
also attached a sheet of paper with the following language to the
revised copy of the 1991 will:

THIRD:  I hereby create a Trust and give into it
all the rest, residue and remainder of my property of
every kind and nature and wheresoever situate, such to
be held secure for my grandson Barney Peter Aronson, if
she [sic] survives me, and if so, "Jo" is to receive as
much income from such assets as she needs, for as long
as she lives, and upon her death this Trust will then
be liquidated and the proceeds given to my grandson,
Barney Peter Aronson, as administered by the Executor,
Barney Peter Aronson, or if he be dead, by alternate
Executor, son Barney Roman Aronson, or third, if he
also be dead, by grandson, Scott Haley Aronson, or if
Barney Peter Aronson predecease me, Scott Haley Aronson
shal [sic] take his place as my heir and as Executor,
or if "Jo" predeceases me, division will proceed as
ordered above.

A.  The Executor will be paid the
established legal Executors Commission, which
at this writing is understood to be 5% of the

first $100,000, 4% of the next $200,000, 3% of the next $700,000, and 2½% of the next of the next $4 million, and 2% thereafter.

B. The Executor will see that "Jo", if she survives me, receives interest and dividend income sufficient to her needs.

C. If an emergency requires "Jo" to have some of the assets in the Trust, the Executor will allot such funds as he determines "Jo" needs.

D. Upon "Jo's" death, if she survives me, all the estate shall go to Barney Peter Aronson as described above.

E. In my personal effects are "Chuck Aronson's Journals" which the Executor will keep safe and secure in perpetutity, [sic] to be used as seen fit, but in no way destroyed.

On May 18, 1993, Mr. Newman wrote a letter to decedent. Mr. Newman wrote: "I have received your letter to me dated May 12th and have redrawn your wills per your request, copies of which I have enclosed. Please advise if they are satisfactory with you."

On May 20, 1993, decedent wrote a letter to Mr. Newman. Decedent pointed out a few typographical errors in the new draft of his will and instructed Mr. Newman to correct them. The new will otherwise looked fine to decedent, but decedent noted that he was not an expert about estates and the law; for that he depended on Mr. Newman. Decedent continued: "I am satisfied with the Wills (after the typos are corrected) and if you, too, are satisfied these Wills will go through Probate and all with no

trouble or successful contesting, please have the final Wills prepared and witnessed and all as we did before."

On May 24, 1993, Mr. Newman wrote a letter to decedent.  Mr. Newman informed decedent that he had finalized decedent's new will and wanted to come to the Big House on May 28, 1993, for decedent to execute the new will.

On May 28, 1993, decedent executed a new will (1993 will). The 1993 will revoked all former wills and codicils and provided, in relevant parts, as follows:

> SECOND:  I hereby give, devise and bequeath my real property (which shall include my residence which I refer to as "Hundred Acres" should my wife, JOSEPHINE R. ARONSON, hereinafter referred to as "JO", predecease me), my vehicles and machinery to my grandson, BARNEY PETER ARONSON.  It is hereby stipulated that no changes or alterations in the structure or the general make-up of the "Big House" on Hundred Acres shall ever be made.

> THIRD:  I hereby create a Trust and give into it all the rest, residue and remainder of my property of every kind and nature and wheresoever situate, such to be held secure for my grandson, BARNEY PETER ARONSON, if he survives me, and if so, "JO" is to receive as much income from such assets as she needs, for as long as she lives, and upon her death this Trust will then be liquidated and the proceeds given to my grandson, BARNEY PETER ARONSON, as administered by the Executor, BARNEY PETER ARONSON, or if he be dead, by alternate Executor, my son BARNEY ROMAN ARONSON, or third, if he also be dead, my grandson, SCOTT HALEY ARONSON, or if BARNEY PETER ARONSON predecease me, SCOTT HALEY ARONSON shall take his place as my heir and as Executor, or if "JO" predeceases me, division will proceed as ordered above.

*    *    *    *    *    *    *

B.  The Executor will see that "JO", if she survives me, receives interest and dividend income sufficient to her needs.

C.  If an emergency requires "JO" to have some of the assets in the Trust, the Executor will allot such funds as he determines "JO" needs.

D.  Upon "JO's" death, if she survives me, all the estate shall go to BARNEY PETER ARONSON as described above.

E.  In my personal effects are "Chuck Aronson's Journal's", which the Executor will keep safe and secure in perpetutity, [sic] to be used as seen fit, but in no way destroyed.

* * * * * * *

FIFTH:  I hereby direct that all inheritance, estate, transfer, succession or other taxes (including any interest or penalties) shall be paid out of my residual estate and that all beneficiaries under this Will shall receive legacies, bequests and devises free and exempt from any and all such tax payment.

LASTLY:  I hereby nominate and appoint my grandson, BARNEY PETER ARONSON, to be the executor of this my Last Will and Testament, and the trustee of any trust herein created.  I further direct that the said executor and trustee shall act as such without bond or other security in either event, and have all the powers contained in the New York Fiduciary Powers Act.

Mr. Newman provided a proof of will to decedent.

On December 20, 1996, decedent died testate.

On January 9, 1997, Mr. Newman probated the 1993 will in the Surrogate's Court, State of New York, County of Cattaraugus (Surrogate's Court).  Around this time, Mr. Newman advised Bar that once decedent had died and the 1993 will had been probated, it could not be changed.

On January 25, 1997, Bar wrote a letter to Mr. Newman.  Bar wrote:  "Due to the complexities of the interpretation of my grandfather Chuck's will and the need for creative estate planning I have retained the services of an estate specialist: Mr. Roger Simon".

Mr. Simon was more experienced in estate planning than Mr. Newman.  Decedent had not known Mr. Simon.  Seidman & Seidman referred Bar to Mr. Simon.  After talking to Mr. Simon, Bar thought there was a possibility that the 1993 will could be changed.

Mr. Simon suggested that Bar file a petition in the Surrogate's Court.  Bar petitioned the Surrogate's Court in order to decrease the amount of estate tax owed.

On February 5, 1998, Bar filed a "PETITION UNDER SPCA 1420(A) FOR CONSTRUCTION AND REFORMATION OF WILL" regarding the 1993 will (1998 petition) in the Surrogate's Court.  The 1998 petition referred to the 1993 will as "home-drawn" and "drawn by the Testator himself".  The 1998 petition sought to reform and construe the third article of the 1993 will as requiring that all income of the trust be paid to Jo and to sever the trust holding the residue of decedent's estate into three separate trusts--a credit shelter trust, a reverse QTIP trust, and a residuary trust.  The 1998 petition states:  "The sole purpose and effect of the proposed construction, restructuring and severing of the

Trust would be to insure that decedent's estate receives a full marital deduction, fully utilizes the decedent's credit shelter amount and reduces substantially the generation-skipping transfer ("GST") tax that will be payable by reason of distributions from the Trust." The 1998 petition asserts that decedent always intended to minimize the estate tax and GST tax on his estate. The 1998 petition further states: "Your Petitioner believes that if this Court will reform and construe Article THIRD of the Will to sever the residue of Decedent's estate into three trusts as set forth, this will insure the foregoing potentially considerable estate tax and GST tax savings."

On February 10, 1998, Jo filed a waiver and consent to the 1998 petition waiving service and consenting in full to the relief requested in the 1998 petition.

On February 17, 1998, Scott Haley Aronson filed a waiver and consent to the 1998 petition waiving service and consenting in full to the relief requested in the 1998 petition.

On March 5, 1998, Bar filed an "AMENDED PETITION UNDER SPCA 1420(A) FOR CONSTRUCTION AND REFORMATION OF WILL" regarding the 1993 will (1998 amended petition) in the Surrogate's Court. The 1998 amended petition was virtually identical to the original petition and contained only a few changes--such as adding Scott Haley Aronson as a beneficiary if Bar predeceased Jo.

On March 13, 1998, Jo and Scott Haley Aronson each filed a waiver and consent to the 1998 amended petition waiving service and consenting in full to the relief requested in the 1998 amended petition.

On March 16, 1998, the Surrogate's Court entered a decree granting the relief sought in the amended petition (Surrogate's Court decree). The Surrogate's Court construed the 1993 will to require that all income of the trust be paid to Jo at least semi-annually. The Surrogate's Court further ordered and decreed:

> that Article THIRD of the said Last Will and Testament of CHARLES N. ARONSON be reformed to read as follows:
>
> THIRD
>
> A. In the event that my wife, JOSEPHINE R. ARONSON, survives me, I give and bequeath an amount equal to the exemption equivalent amount, as hereinafter defined, to my Trustee hereinafter named, IN TRUST, for the following uses and purposes:
>
> 1. My Trustee shall invest and reinvest the same and shall collect and receive the income thereof and, after deducting the necessary and proper expenses therewith, shall pay over said net income to my wife, JOSEPHINE R. ARONSON, in monthly, quarterly, or other convenient payments of nearly equal amounts as possible during her lifetime, provided, however, that in no event shall such payments be made less frequently than semi-annually.
>
> 2. I hereby authorize my Trustee, in his sole discretion, in the event that both the principal of the residuary trust and the principal of the reverse Q-Tip trust shall at any time become exhausted, to withdraw from the principal of this trust and pay over to my said wife, JOSEPHINE R. ARONSON, or for her benefit, such amount or amounts as may be deemed necessary or desirable for medical, surgical, hospital, nursing or other expenses relating to any illness of,

accident to or emergency affecting my said wife, or as may be determined necessary or desirable for her maintenance and support.

3.   Upon the death of my said wife, JOSEPHINE R. ARONSON, after my death, or if she shall have predeceased me, then at the time of my death, the then remaining principal of this trust or the amount which would have constituted the principal of this trust, as the case may be, shall be paid over and distributed to my grandson, BARNEY P. ARONSON, if he is living at the time, to be his absolutely.  In the event that the said BARNEY P. ARONSON shall predecease the said JOSEPHINE R. ARONSON, the same shall be paid over and distributed to my grandson, SCOTT HALEY ARONSON.

4.   The exemption equivalent amount referred to above shall equal the largest amount, if any, by which my taxable estate for federal estate tax purposes (determined without regard to this Article) could be increased without increasing the federal estate taxes payable by reason of my death after taking into account the unified credit and credit for state death taxes available against such tax (provided that the credit for state death taxes shall not be taken into account if I die a resident of a state whose estate or other death tax is limited to the federal estate tax credit for state death tax).

5.   I direct my Executor to make the special election under §2652(a) of the Internal Revenue Code with respect to this trust so that I shall be treated as the transferor of such trust for GST tax purposes.

B.   In the event that my wife, JOSEPHINE R. ARONSON, survives me, I give and bequeath an amount equal to the excess GST exemption amount, as hereinafter defined, to my Trustee hereinafter named, IN TRUST, * * * for the following uses and purposes:

1.   My Trustee shall invest and reinvest the same and shall collect and receive the income thereof and after deducting the necessary and proper expenses therewith, shall pay over said net income to my said wife, JOSEPHINE R. ARONSON, in monthly, quarterly, or other convenient periodic payments of as nearly equal

amounts as possible during her lifetime, provided, however, that in no event shall such payments be made less frequently than semi-annually.

2. I hereby authorize my Trustee, in the event that the residuary trust set forth hereinafter shall be exhausted, to withdraw from the principal of this trust and pay over to my said wife, JOSEPHINE R. ARONSON, or for her benefit, such amount or amounts as, in the sole discretion of my Trustee, may be deemed necessary or desirable for medical, surgical, hospital, nursing or other expenses relating to illness of, accident to or emergency affecting my said wife, or as may be determined necessary, desirable for her maintenance and support.

3. In the event that the principal of this trust contains unproductive property not likely to produce income during her lifetime, my said wife, JOSEPHINE R. ARONSON, shall have the power to require the Trustee either to make such property productive or to convert it within a reasonable time to income producing property. A written statement signed by my said wife and delivered to my Trustee shall be sufficient for this purpose.

4. Upon the death of my said wife, JOSEPHINE R. ARONSON, after my death, or in the event my said wife has predeceased me, then at the time of my death, the entire remaining principal of this trust, or the amount which would have constituted the principal of this trust, as the case may be, shall be paid over and distributed to my said grandson, BARNEY P. ARONSON, if he is living at the time, to be his absolutely. In the event that the said BARNEY P. ARONSON shall predecease the said JOSEPHINE R. ARONSON, the same shall be paid over and distributed to my grandson, SCOTT HALEY ARONSON.

5. I hereby authorize my Executor, in his sole discretion, to elect that any part or all of the amount passing under this Article THIRD (B) be treated as qualified terminable interest property for the purposes of qualifying for the marital deduction allowable in determining the federal estate tax upon my death.

6.   The excess GST exemption amount shall equal the amount by which my unused GST exemption (as that term is used in §2631 of the Internal Revenue Code) available at the time of my death exceeds the value of the property disposed of under Articles SECOND and THIRD (A) above of this, my Last Will and Testament.

7.   I direct my Executor to make the special election under §2652(a) of the Internal Revenue Code with respect to this trust so that I shall be treated as the transferor of such trust for GST tax purposes.

C.   All of the rest, residue and remainder of my estate, real, personal and mixed, of whatever nature and wherever situate, which I may own or have the right to dispose of at the time of my death (hereinafter referred to as "my residuary estate"), I give, devise and bequeath to my Trustee hereinafter named, IN TRUST (hereinafter referred to as "the residuary trust") for the following uses and purposes:

1.   My Trustee shall invest and reinvest the same and shall collect and receive the income thereof and, after deducting the necessary and proper expenses therewith, shall pay over said net income to my said wife, JOSEPHINE R. ARONSON, in monthly, quarterly, or other convenient periodic payments of nearly equal amounts as possible during her lifetime, provided, however, that in no event shall such payments be made less frequently than semi-annually.

2.   I hereby authorize my Trustee to withdraw from the principal of this trust and pay over to my said wife, JOSEPHINE R. ARONSON, or for her benefit, such amount or amounts as, in the sole discretion of my Trustee, may be deemed necessary or desirable for medical, surgical, hospital, nursing or other expenses relating to illness of, accident to or emergency affecting my said wife, or as may be determined necessary, desirable for her maintenance and support.

3.   In the event that the principal of this trust contains unproductive property not likely to produce income during her lifetime, my said wife, JOSEPHINE R. ARONSON, shall have the power to require the Trustee either to make such property productive or to convert it within a reasonable time to income

producing property.  A written statement signed by my said wife and delivered to my Trustee shall be sufficient for this purpose.

4.  Upon the death of my said wife, JOSEPHINE R. ARONSON, after my death, or in the event my said wife has predeceased me, then at the time of my death, the entire remaining principal of this trust, or the amount which would have constituted the principal of this trust, as the case may be, shall be paid over and distributed to my said grandson, BARNEY P. ARONSON, if he is living at the time, to be his absolutely.  In the event that the said BARNEY P. ARONSON shall predecease the said JOSEPHINE R. ARONSON, the same shall be paid over and distributed to my grandson, SCOTT HALEY ARONSON.

5.  I hereby authorize my Executor, in his sole discretion, to elect that any part or all of the amount passing under this Article THIRD (C) be treated as qualified terminal [sic] interest property for the purposes of qualifying for the marital deduction allowable in determining the federal estate tax upon my death.

D.  I hereby direct that the for the purpose of calculating annual Trustee commissions hereunder (and solely for that purpose), the trusts created under Paragraphs A, B, and C above shall be aggregated and treated as one trust and such commissions shall be charged to each such trust on a pro-rata basis.

The Surrogate's Court entered the Surrogate's Court decree without holding any hearings--no witnesses were called to testify, no affidavits were submitted, and no evidence was received by the Surrogate's Court.

On May 14, 1998, Bar, as executor, timely filed a Federal estate tax return on behalf of decedent's estate (the return). On page 2 of the return, in the schedule for individuals (other than the surviving spouse), trusts, and estates who received

benefits from the estate, the sole person listed was Bar in the amount of $1 million. Schedule E, Jointly Owned Property, of the return listed $1,065,420.63 of qualified joint interests. Schedule F, Other Miscellaneous Property Not Reportable Under Any Other Schedule, of the return listed two safe deposit boxes that decedent and Jo held jointly. On Schedule M, Bequests, etc., to Surviving Spouse, of the return, the "No" box was checked next to "Election Out of QTIP Treatment of Annuities". On Form 712, Life Insurance Statement, attached to the return, Jo was listed as the owner and beneficiary of life insurance on decedent's life.

OPINION

Section 2001 imposes a tax on the transfer of the taxable estate of all decedents who are citizens or residents of the United States. The amount of the tax is determined, in part, by the value of the taxable estate. Sec. 2001(b). Section 2051 defines the value of the taxable estate as the gross estate less deductions. "For estate taxes, as for income taxes, 'Deductions are a matter of legislative grace, and a taxpayer seeking the benefit of a deduction must show that every condition which Congress has seen fit to impose has been fully satisfied.'"[5]

---

[5] For the first time in the reply brief, the estate raises the issue of respondent's bearing the burden of proof pursuant to sec. 7491(a), as amended. Generally, we will not consider an issue that is raised for the first time on brief. See Foil v. Commissioner, 92 T.C. 376, 418 (1989), affd. 920 F.2d 1196 (5th Cir. 1990); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975).

(continued...)

Estate of Nicholson v. Commissioner, 94 T.C. 666, 681-682 (1990)
(citations omitted).

Pursuant to section 2056(a), the estate may claim, as a
marital deduction, the value of property passing to the surviving
spouse.  As a general rule, the marital deduction is denied for a
"terminable interest".  Estate of Nicholson v. Commissioner,
supra at 671.  A "terminable interest", generally, is a property
interest that will terminate or fail "on the lapse of time, on
the occurrence of an event or contingency, or on the failure of
an event or contingency to occur".  Sec. 2056(b)(1).  An interest
in the nature of a life estate, therefore, is ineligible for the
marital deduction pursuant to section 2056(b)(5).  Estate of
Nicholson v. Commissioner, supra at 671-672.

The Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34,
95 Stat. 172, modified the rules for the marital deduction
relating to terminable interests.  ERTA sec. 403(d)(1), 95 Stat.
302, added section 2056(b)(7), which allows a marital deduction

---

[5](...continued)
In the context of sec. 7491, by failing to raise the sec. 7491(a)
argument at or before trial, petitioner prejudiced respondent's
ability to present evidence that petitioner did not meet the
requirements of sec. 7491(a)--e.g., that petitioner did not
comply with the substantiation requirements or that petitioner
was not cooperative.

We note, however, because we make our determination on the
basis of the evidence in the record rather than on a failure to
carry the burden of proof by a party bearing the burden, our
decision in this case does not depend on which party bears the
burden of proof.

for QTIP interests.  Estate of Nicholson v. Commissioner, supra at 672.  A QTIP interest is one in which a decedent passes to the surviving spouse a "qualifying income interest for life" and for which an election has been made.  Sec. 2056(b)(7)(B)(i);[6] Estate of Nicholson v. Commissioner, supra.  Generally, when the surviving spouse has a "qualifying income interest for life", she

---

[6]  Sec. 2056(b)(7)(B), in pertinent part, provides:

      (7) Election with respect to life estate for surviving spouse.--

                  *   *   *   *   *   *   *

      (B) * * * For purposes of this paragraph--

            (i) In general.--The term "qualified terminable interest property" means property–

                  (I) which passes from the decedent,

                  (II) in which the surviving spouse has a qualifying income interest for life, and

                  (III) to which an election under this paragraph applies.

            (ii) Qualifying income interest for life.--The surviving spouse has a qualifying income interest for life if--

                  (I) the surviving spouse is entitled to all the income from the property, payable annually or at more frequent intervals, * * * and

                  (II) no person has a power to appoint any part of the property to any person other than the surviving spouse.

is entitled to "all the income from the property, payable annually or at more frequent intervals".  Sec. 2056(b)(7)(B)(ii).

A QTIP interest must meet the requirements of section 20.2056(b)-5(f), Estate Tax Regs.  Estate of Nicholson v. Commissioner, supra at 672; sec. 20.2056(b)-7(d)(2), Estate Tax Regs.; see H. Rept. 97-201, at 161 (1981), 1981-2 C.B. 352, 378. Section 20.2056(b)-5(f), Estate Tax Regs., provides that a surviving spouse is entitled to "all the income from the property" if the effect of the trust is to give her the equivalent "beneficial enjoyment" of the trust estate as one who is "unqualifiedly designated as the life beneficiary" under the principles of the law of trusts.  Generally, absent indications to the contrary, the "designation of the spouse as sole income beneficiary for life of the entire interest or a specific portion of the entire interest will be sufficient".  Sec. 20.2056(b)-5(f)(1), Estate Tax Regs.

An interest passing in trust, however, does not provide that the surviving spouse is entitled to "all the income" to the extent that the income may be accumulated in the discretion of any person other than the surviving spouse or to the extent that the consent of any person other than the surviving spouse is required for distribution of the income.  Sec. 20.2056(b)-5(f)(7), Estate Tax Regs.  Additionally, the terms "entitled for life" and "payable annually or more frequent intervals" require

that under the terms of the trust the income referred to must be currently (at least annually) distributable to the spouse or that she must have such command over the income that it is virtually hers. Sec. 20.2056(b)-5(f)(8), Estate Tax Regs.

A determination of the nature of the interest that passes to the surviving spouse is made pursuant to the law of the jurisdiction under which the interest passes. Estate of Nicholson v. Commissioner, supra at 672-673. In the instant case, that is the law of New York. Although we will look to local law to determine the nature of the interests provided under a trust document, we are not bound to give effect to a local court order that modifies that document after the Commissioner has acquired rights to tax revenues under its terms. E.g., id. at 673. The law is clear that we are not bound by the action of a State trial court, such as the Surrogate's Court, that has not been affirmed by the State's highest court. Commissioner v. Estate of Bosch, 387 U.S. 456 (1967).

"[I]n construing a will, the intention of the testator must be our 'absolute guide'". In re Bieley, 695 N.E.2d 1119, 1122 (N.Y. 1998) (citations omitted); see In re Selner, 26 N.Y.S.2d 783 (App. Div.), affd. 39 N.E.2d 287 (N.Y. 1941). "The prime consideration * * * is the intention of the testator as expressed in the will. All rules of interpretation are subordinated to the requirement that the actual purpose of the testator be sought and

effectuated as far as is consonant with principles of law and public policy." In re Fabbri, 140 N.E.2d 269, 271 (N.Y. 1957). It is the duty of the Court to carry out the testator's purpose, notwithstanding that general rules of interpretation might point to a different result. In re Bieley, supra; In re Fabbri, supra at 271.

The testator's intent is to be ascertained not from a single word or phrase, but from a sympathetic reading of the will as an entirety and in view of all the facts and circumstances under which the provisions of the will were framed. In re Bieley, supra; In re Fabbri, supra; see In re Selner, supra. A sympathetic reading of the will in its entirety in light of the surrounding facts and circumstances, however, is distinguishable from the use of extrinsic evidence to gauge testamentary intent. Extrinsic evidence is inadmissible in the absence of an ambiguity in the will. In re Bieley, supra at 1123 n.2; In re Fabbri, supra at 274. If a dominant purpose or plan of distribution is discernable from the will, the individual parts of the will must be read in relation to that purpose and given effect accordingly. In re Fabbri, supra at 271.

Under the terms of the trust at issue (i.e., in the 1993 will), Jo is not "entitled to all the income from the property, payable annually or at more frequent intervals" as is required by section 2056(b)(7). See Estate of Nicholson v. Commissioner, 94

T.C. at 674; Estate of Rapp v. Commissioner, T.C. Memo. 1996-10, affd. 140 F.3d 1211 (9th Cir. 1998); see also sec. 20.2056(b)-5(f), Estate Tax Regs.  The unambiguous language of the 1993 will allows her only "as much income from such assets as she needs, for as long as she lives".  (Emphasis added.)  The 1993 will does not mention the marital deduction, nor is there any evidence from the language of the 1993 will that decedent intended the trust property to qualify for the marital deduction.

In the context of the trust at issue, the provision for "as much income from such assets as she needs, for as long as she lives" gives Jo only such income as she may reasonably need, but not necessarily all the income that she may demand.  See Estate of Nicholson v. Commissioner, supra at 674.  The 1993 will reveals decedent's intention that Jo have neither the obligation, nor the right, to demand "all the income", or any particular amount of income, from the trust.  The implication of this language is that Jo's requirements for income from the trust were to be evaluated in light of her assets and income from other sources--such as from the $1,065,420.63 of joint property listed on the estate tax return.  The availability of income from other sources, her "squirreled-away caches", the life insurance proceeds, the contents of the two safe deposit boxes, and the sizable value of her assets would lower the amount of trust income she might otherwise need, again indicating that she is not

"entitled to all the income" from the trust created by the 1993 will. See id. at 677.

The fact that the 1993 will does not make specific provision for the disposition of the income in excess of the amount Jo needed does not establish decedent's intention that there would be no excess income. See id. at 675. The 1993 will provides that upon Jo's death the trust "will then be liquidated and the proceeds given to my grandson, BARNEY PETER ARONSON, * * * or if BARNEY PETER ARONSON predecease me, SCOTT HALEY ARONSON shall take his place as my heir". This bequest makes no distinction between trust corpus and trust income. It is therefore clear that decedent intended a gift of the corpus and the undistributed income component of the trust to Bar (or Scott Haley Aronson if Bar was deceased) after Jo died. See id.

The 1993 will, as executed by decedent, and as in existence at the time of his death, fails to establish that Jo is "unqualifiedly designated as the life beneficiary". Furthermore, the 1993 will does not designate Jo as the "sole income beneficiary for life." Sec. 20.2056(b)-5(f), Estate Tax Regs. Instead, the 1993 will limits Jo's trust income to the amount she would "need". Any excess would go to the remainderman. Under the trust at issue, Jo is not "entitled to all the income" from the property within the meaning of section 2056(b)(7)(B)(ii), and

her interest in the trust does not qualify for the marital deduction.[7]

The estate contends that the language of the 1993 will is ambiguous. Even if the estate is correct, and we are permitted to look at extrinsic evidence, the extrinsic evidence does not support the estate's contention that decedent intended (1) to leave his wife all the income from the trust, (2) to enable the estate to qualify for the marital deduction under the terms of the 1993 will, or (3) to minimize the estate's tax liability.

Before the time that decedent executed the 1993 will, the record shows that decedent was aware of the QTIP provisions and the marital deduction. Before the 1993 will, decedent had a will which contained a QTIP provision. Mr. Newman was aware of the marital deduction when he prepared decedent's wills.

Mr. Newman received specific directions from decedent regarding the provisions and language to be used in the 1993 will (as well as decedent's prior wills that Mr. Newman worked on). The directions were detailed and explicit. In order to follow decedent's directions, Mr. Newman was careful to make sure he used decedent's words. Mr. Newman did not draft the following language contained in the 1993 will: "'Jo' is to receive as much

_____

[7] In light of our holding, we need not address the issue of whether the trust fails to qualify as a QTIP interest, and for the marital deduction, because Jo was not entitled to receive distributions payable annually or at more frequent intervals.

income from such assets as she needs, for as long as she lives". The language was chosen by decedent and reflected his directions; Mr. Newman merely had the words decedent chose typed.

Bar testified that during decedent's later years, many of decedent's investment decisions were made to ensure Bar would be able to maintain Hundred Acres and the Big House. Decedent's intent that Hundred Acres and the Big House be maintained after his death is also evident from the succession of wills he had prepared and the letters he wrote accompanying the preparation of those wills.

In the 1980 will, decedent did not leave Bar the Big House or the Little House. After Bar moved to Hundred Acres, decedent changed his will (the 1982 will) to leave Bar the use of the Little House. In the 1988 proposed will, the Big House was distributed to decedent's eight descendants per capita. Later in 1988, decedent decided to give Hundred Acres and the Big House solely to Bar. At that time, decedent was also concerned that changes would be made to the Big House, so he had his will rewritten (the July 1988 will) to prevent that from happening. In 1991, decedent eliminated his great-grandchildren from his will and increased Bar's share to make sure Bar would have enough money to maintain Hundred Acres and the Big House. In 1993, decedent eliminated his only child and all his grandchildren other than Bar to make sure Bar would have enough money to

maintain Hundred Acres and the Big House.  Decedent also repeatedly asked Mr. Newman, and his C.P.A., to provide him figures on what his estate would be worth <u>after taxes</u> to ensure that there would be enough money left over <u>after taxes</u> for Bar to maintain Hundred Acres and the Big House.

Additionally, the language of the 1980 will, 1982 will, 1988 proposed will, July 1988 will, and 1991 will provided that <u>all the income</u> from the trusts created in those wills was to be paid to Jo.  Decedent, when drafting the 1993 will, specifically deleted the language providing that all the income from the trust was to be paid to Jo.  Decedent, when drafting the 1993 will, substituted the language limiting the distributions from the trust to the amount of income Jo needed.

Furthermore, decedent specifically contemplated, and expressly indicated, that estate taxes would be paid.  He asked numerous questions about the estate tax.  He was informed of the GST tax.  Decedent repeatedly, and explicitly, indicated that he would rather pay estate tax than give up control over how his estate was distributed.  Decedent repeatedly, and explicitly, indicated that he expected that estate taxes would be paid.  The fact that the 1993 will made provisions for the payment of estate taxes reflected decedent's expectation that there would be estate taxes that would need to be paid.  Decedent's April 13, 1993,

explanation of the 1993 will also contemplated a sizable estate tax and GST tax "burden".

Decedent's other major concern (other than maintaining Hundred Acres and the Big House as a monument to him) was that his estate pass through probate with no difficulties. Decedent included language in the 1988 proposed will, which he wrote, for Mr. Newman to sign indicating that the will would pass through probate with no difficulties. Decedent restated this concern in 1993 when he wrote to Mr. Newman and sought assurance that his will would go through probate successfully and would withstand any challenges.

The extrinsic evidence shows that Mr. Newman did exactly as decedent wished: He used the language decedent wanted, he prepared a will that was probated successfully, and he prepared a will in which decedent set aside money after taxes for Bar to maintain Hundred Acres and the Big House. Decedent specifically did not have the 1993 will drafted with an intention to maximize the marital deduction or minimize the estate tax. Accordingly, there is no reason to contort the language decedent used to achieve that result. See Estate of Heim v. Commissioner, 914 F.2d 1322 (9th Cir. 1990), affg. T.C. Memo. 1988-433; Estate of Nicholson v. Commissioner, 94 T.C. at 679.

Accordingly, the extrinsic evidence fails to show that decedent intended that Jo be "entitled to all the income" from the trust.

The estate argues that after giving proper regard to the Surrogate's Court decree, the trust qualifies as a QTIP interest. We disagree.

The Surrogate's Court decree did not merely clarify the 1993 will. The 1993 will did not require that all the income go to Jo; the Surrogate's Court decree, however, required all the income to go to her. The 1993 will did not require payments to be made at any specific time; the Surrogate's Court decree, however, mandated "monthly, quarterly, or other convenient payments of nearly equal amounts as possible during her lifetime, provided, however, that in no event shall such payments be made less frequently than semi-annually." The Surrogate's Court decree also made voluminous other changes to the trust provided for by decedent in the 1993 will. The Surrogate's Court decree is more than a mere clarification; it is a substantial change in the 1993 will (and the trust created therein) made after respondent had secured rights under the 1993 will. Accordingly, we will not give it effect. See Estate of Nicholson v. Commissioner, supra at 681; see also Commissioner v. Estate of Bosch, 387 U.S. 456 (1967).

Additionally, the Surrogate's Court decree was not a bona fide evaluation of the rights of Jo because there was not a "genuine and active contest" in the Surrogate's Court--the decree was rendered by consent.  See Estate of Rapp v. Commissioner, T.C. Memo. 1996-10; sec. 20.2056(c)-2(d)(2), Estate Tax Regs. Bar petitioned the Surrogate's Court for the specific purpose of directly affecting Federal estate tax liability (Bar wanted to reduce the amount of taxes due from the estate that were a consequence of the 1993 will executed by decedent).  See Commissioner v. Estate of Bosch, supra at 463.  Bar filed the 1998 petition and the 1998 amended petition in an attempt to engage in postdeath "creative estate planning" and to ensure "considerable estate tax and GST tax savings".

Furthermore, the Surrogate's Court decree was based on incorrect information (i.e., that decedent intended to minimize the estate tax and GST tax on his estate) provided by Bar.[8]  Had the Surrogate's Court heard the testimony of Mr. Newman or been provided the letters that decedent wrote, it would have been clear to the Surrogate's Court that decedent's intention was not to minimize the estate taxes or GST taxes on his estate.

---

[8]  We make no finding regarding whether Bar intentionally provided information he knew to be incorrect to the Surrogate's Court in order to obtain a result that would significantly reduce the amount of taxes owed by the estate (and thereby increase the amount of his inheritance).  That does not change the fact, however, that the Surrogate's Court based its actions on incorrect information.

The estate contends that New York law and public policy favor the marital deduction and presume that taxpayers wish to take advantage of it.  The estate relies on In re Choate, 533 N.Y.S.2d 272 (Sur. Ct. 1988).  Initially, we note that this case is a decision of a lower court that was not affirmed by New York's highest court.  Accordingly, this decision is not binding on us.  Commissioner v. Estate of Bosch, supra.

Even so, Choate is distinguishable.  In Choate, the court found that the proposed reformation did not alter the testator's dispositive scheme under the testator's will.  The court found that the testator in Choate intended to take full advantage of the available tax deductions and exemptions.  That is not the case herein.  Additionally, in Choate, there was a change in law (the imposition of the GST tax) that was not in effect when the testator executed his will.  Again, that is not the case herein.

The estate also cites N.Y. Est. Powers & Trusts Law (EPTL) section 13-1.3 (McKinney 2003) for support.  N.Y. EPTL section 13-1.3 provides the order in which assets are abated in paying the expenses of an estate.  The order of abatement provided for in this section does not, however, apply to estate taxes.  N.Y. EPTL sec. 13-1.3(d).  Estate taxes are apportioned under N.Y. EPTL section 2-1.8 (McKinney 2003).

N.Y. EPTL section 2-1.8 does not support petitioner's position either.  N.Y. EPTL section 2-1.8 applies to apportion

the estate tax "except in a case where a testator otherwise directs in his will". N.Y. EPTL sec. 2-1.8(a). Decedent provided for the payment of estate taxes in the fifth article of the 1993 will. Accordingly, N.Y. EPTL section 2-1.8 is inapplicable.

Furthermore, the estate relies on a <u>presumption</u>. Even if the law and public policy <u>favor</u> the marital deduction and <u>presume</u> that taxpayers wish to take advantage of it, the taxpayer's express direction overrides this presumption. Decedent expressly stated on numerous occasions that he would rather pay tax than give up control of his estate. Whereas decedent indicated in 1988 that Bar should fight any <u>valuation</u> of the estate that he felt was excessive and decedent was willing to make $10,000-per-year gifts (although it is not clear that decedent still felt this way when he drafted the 1993 will), decedent wanted control over the property each beneficiary would receive and was not willing to give up this control in order to minimize estate tax. Decedent, when he rewrote his own will, eliminated language referring to the marital deduction and eliminated QTIP provisions from his wills.

The estate also argues that N.Y. EPTL section 10-10.1 (McKinney 2003) provides that Bar was required to distribute all the income of the trust to Jo. We disagree. N.Y. EPTL section 10-10.1 provides:

> Except in the case of a trust which is revocable by such person during lifetime, a power conferred upon a person in his or her capacity as trustee of an express trust to make discretionary distribution of either principal or income to himself or herself or to make discretionary allocations in his or her own favor of receipts or expenses as between principal and income, cannot be exercised by him or her. * * * If there is no trustee qualified to execute the power, its execution devolves on the supreme court or the surrogate's court, except that if the power is created by will, its execution devolves on the surrogate's court having jurisdiction of the estate of the donor of the power.

The trust in the 1993 will did not give Bar discretionary power to make distributions of income or principal to himself or allocations in his own favor. Even if it did, this power would devolve on the Surrogate's Court. Furthermore, N.Y. EPTL section 10-10.1 does not give Bar or the Surrogate's Court the power to pay Jo any more than she needs.[9]

We conclude that the interest in the trust created by the 1993 will does not qualify for the estate tax marital deduction as "qualified terminable interest property" within the meaning of section 2056(b)(7). In reaching our holding herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

---

[9] Even if N.Y. Est. Powers & Trusts Law sec. 10-10.1 (McKinney 2003) required Bar to pay all the income of the trust to Jo, it does not require him to pay it to her annually or at more frequent intervals.

To reflect the foregoing,

Decision will be entered

for respondent.