T.C. Memo. 2006-215

UNITED STATES TAX COURT

ESTATE OF SARAH M. DAVENPORT, DECEASED, RICHARD DAVENPORT,
EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16060-04.                    Filed October 5, 2006.

D died on Oct. 31, 2000, and a Federal estate tax
return was thereafter filed on behalf of her estate.

<u>Held</u>:  Two annuities payable under a settlement
agreement are includable in the gross estate pursuant
to sec. 2033, I.R.C.

<u>Held</u>, <u>further</u>, for purposes of inclusion in the
gross estate, the annuities are to be valued under sec.
7520, I.R.C., in accordance with the actuarial
valuation methodology of sec. 20.2031-7(d), Estate Tax
Regs.

<u>Held</u>, <u>further</u>, under the circumstances present in
this case, expenditures incurred for a funeral luncheon
are not properly deductible as funeral expenses under
sec. 2053(a)(1), I.R.C.

John D. Mabley, for petitioner.

John W. Stevens, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WHERRY, Judge:  Respondent determined a Federal estate tax deficiency of $507,103 for the Estate of Sarah M. Davenport (the estate).  The issues for decision are:

(1) Whether two annuities payable under a settlement agreement are includable in the gross estate for Federal tax purposes pursuant to section 2033 or 2039;

(2) whether, in the event that the annuities are to be included in the gross estate, they were properly valued by respondent under section 7520; and

(3) whether the estate is entitled to a deduction for the cost of a funeral luncheon pursuant to section 2053.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.  Sarah M. Davenport (decedent) was a resident of the State of Michigan when she died intestate in that State on October 31, 2000.  Her estate has

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code (Code) in effect as of the date of death of Sarah M. Davenport, and Rule references are to the Tax Court Rules of Practice and Procedure.

since been administered by the Wayne County Probate Court in Detroit, Michigan. The executor of decedent's estate, Richard Davenport (Mr. Davenport) resided in Michigan at the time the petition in this case was filed.

Decedent was born on August 16, 1988, to Mr. Davenport and Donna Weiss-Davenport (Ms. Weiss-Davenport). Thereafter, in August of 1989, a complaint was brought in the Circuit Court for the County of Wayne, State of Michigan, stemming from alleged actions and omissions in relation to the birth of decedent. The complaint named as plaintiffs "Sarah Maria Davenport, a Minor, by her Next Friend, Donna Weiss-Davenport, and Donna Weiss-Davenport and Richard Davenport, Individually". Named defendants included Michelle Shultz, M.D., East Side Gynecology-Obstetrics, P.C., and Bon Secours Hospital (also referred to as the Sisters of Bon Secours Hospital). Marietta S. Robinson served as attorney for the plaintiffs in the lawsuit.

The complaint was premised on allegations that decedent sustained physical injuries and decedent's parents sustained personal injuries as a result of negligence and/or malpractice by the defendants at the time of her birth. Specifically, the complaint recited that decedent:

> suffered a massive hypoxic insult and, as a
> consequence, has failed to develop normally, has
> suffered central nervous system damage including, but
> not limited to, cerebral palsy, motor damage and mental
> retardation and requires special care and treatment and
> will, for the remainder of her natural life, be

required to receive special care and treatment, education and training.

The foregoing lawsuit was subsequently resolved by means of a Settlement Agreement and Release (the settlement agreement) executed by the plaintiffs on September 17, 1991.[2] In consideration for payments set forth in paragraph 2.0 of the settlement agreement (detailed in paragraphs 2.1 through 2.2B),[3] the plaintiffs agreed to release and forever discharge the defendants from any and all claims related to decedent's birth. As most pertinent to the matters at issue here, the settlement agreement provided in part:

2.0  PAYMENTS

In consideration of the release set forth above, the Defendants agree to pay to the individuals named below ("Payees") the sums outlined in this Section 2 below:

2.1  Payments due from Defendants on or before October 1, 1991 as follows:

---

[2] Although the parties stipulated that the plaintiffs signed the agreement on Sept. 17, 2001, a cursory review of the underlying documents reveals a typographical error in substituting 2001 for 1991.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989) (holding that stipulations are properly disregarded where clearly contrary to evidence contained in the record).  A similar error was made in referencing Aug. 16, 1998, as decedent's date of birth.

[3] The settlement agreement and the parties' stipulations, testimony, and briefs seem to use the terms "section" and "paragraph" in a rather random and interchangeable fashion when referring to the various divisions or provisions of the agreement.  The Court, except in instances of direct quotation, will employ "paragraph" throughout this opinion for clarity and simplicity.

$2,775,000 ($100,000 of this amount to be paid by the insurer of Michelle Shultz, M.D. and East Side Obstetrics-Gynecology, P.C.) payable to Donna Weiss-Davenport and Richard Davenport, individually, and the law offices of Marietta S. Robinson, their attorney.

All sums set forth herein constitute damages on account of personal injuries or sickness, within the meaning of Section 104 (a)(2) of the Internal Revenue Code of 1986, as amended.

2.2  Periodic payments from Defendant, Sisters of Bon Secours Hospital, to Donna Weiss-Davenport and Richard Davenport as co-conservators of Sarah Maria Davenport as outlined below:

2.2  A.    $2,500 per month, beginning November 15, 1991, for Sarah's life, compounded annually at 5%, guaranteed 30 years.

All sums set forth herein constitute damages on account of personal injuries or sickness, within the meaning of Section 104 (a)(2) of the Internal Revenue Code of 1986, as amended.

2.2  B.    $2,500 per month, beginning November 15, 1991, for Sarah's life, compounded annually at 5%, guaranteed 30 years.

All sums set forth herein constitute damages on account of personal injuries or sickness, within the meaning of Section 104 (a)(2) of the Internal Revenue Code of 1986, as amended.

3.0  PAYEE'S RIGHTS TO PAYMENTS

Plaintiffs acknowledge that the Periodic Payments cannot be accelerated, deferred, increased or decreased by the Plaintiffs or any Payees; nor shall the Plaintiffs or any Payees have the power to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment or otherwise.

4.0  PAYEE'S BENEFICIARY

Any payments to be made after the death of any Payee pursuant to the terms of this Settlement Agreement shall be made to such person or entity as shall be designated in writing by Payee to Defendant, Sisters of Bon Secours Hospital or its Assignees.  If no person or entity is so designated by Payee, or if the person designated is not living at the time of the Payee's death, such payments shall be made to the estate of the Payee.  Donna Weiss-Davenport and Richard Davenport, as co-conservators for Sarah Maria Davenport, may designate in writing to Defendant, Sisters of Bon Secours Hospital, or the Assignee, the person or entity to whom Periodic Payments should be made in the event of Sarah Maria Davenport's death. * * *

Pursuant to paragraphs 5.0 and 6.0 of the settlement agreement, the Sisters of Bon Secours Hospital was authorized to discharge its obligation under paragraph 2.2A by making a "qualified assignment" to Allstate Settlement Corporation and to fund the periodic payment liability through purchase of an annuity policy from Allstate Life Insurance Company.  Similarly, those provisions authorized the hospital to discharge its liability under paragraph 2.2B of the settlement agreement by making a "qualified assignment" to Safeco Assigned Benefits Service Company and to fund that liability through purchase of an annuity policy from Safeco Life Insurance Company.

The referenced qualified assignments were made and corresponding annuities obtained.  A single premium immediate life annuity was issued by Allstate Life Insurance Company, with Allstate Settlement Corporation designated as the owner, decedent

as the measuring life, and "Donna Weiss-Davenport and Richard Davenport as Co-Conservators of Sara [sic] Maria Davenport" as the payee for benefit checks.  Likewise, a single premium nonparticipating immediate annuity was issued by Safeco Life Insurance Company, with Safeco Assigned Benefits Service Company designated as the owner, decedent as the annuitant, and her parents in their role as "Co-Conservators" as the payee.  Consistent with the settlement agreement, both annuities provided for $2,500 monthly payments commencing November 15, 1991, increasing at a compounded 5 percent annually, for a minimum of 360 payments.  Both annuities also indicated that decedent's estate would be the beneficiary in the event of her death.

As noted above, decedent died on October 31, 2000, due to septic, acute renal failure and cardiogenic shock.  A Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, was filed on her behalf on July 31, 2001.  The Form 706 reported a total gross estate of $414,937.05, total deductions of $51,253.19, a resultant taxable estate of $363,683.86, and a gross estate tax of $109,452.51.  After application of the unified credit, no tax was reported as due.

The principal assets included in the gross estate were mutual fund interests and U.S. Treasury bills.  Schedule I, Annuities, listed the Allstate and Safeco annuities but reported that the respective includable value of each at the date of death

was zero. The claimed deductions incorporated $10,573.35 from Schedule J, Funeral Expenses and Expenses Incurred In Administering Property Subject to Claims. The funeral expenses included $3,638.92 for "Funeral luncheon", and the administration expenses included $1,451.25 labeled as "Wayne County Probate Court".

The Form 706 was subsequently examined by the Internal Revenue Service (IRS). During the ensuing audit process, a representative of the estate provided the examiner with a copy of an inventory prepared for the Wayne County Probate Court. The inventory had been signed by decedent's parents on February 14, 2001, and was apparently filed with the probate court on March 9, 2001, accompanied by payment of a $1,331.25 inventory fee. The inventory reflected the estate's interest in the Allstate and Safeco annuities at a value of $1,118,000. Later, the estate provided the examiner with two amended inventories that excluded the value of the annuities.

On June 10, 2004, the IRS issued to the estate a statutory notice determining the aforementioned deficiency of $507,103. The determined deficiency was based upon the inclusion in the gross estate of the Allstate and Safeco annuities at a combined value of $1,514,572 and the disallowance of the $3,639 (rounded) for the funeral luncheon. The estate timely petitioned this Court for redetermination.

OPINION

## I. Burden of Proof

As a general rule, determinations by the Commissioner are presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a). Section 7491 may operate, however, in specified circumstances to place the burden on the Commissioner. Section 7491 is applicable to court proceedings that arise in connection with examinations commencing after July 22, 1998, and reads in pertinent part:

SEC. 7491. BURDEN OF PROOF.

(a) Burden Shifts Where Taxpayer Produces Credible Evidence.--

(1) General rule.--If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

(2) Limitations.--Paragraph (1) shall apply with respect to an issue only if--

(A) the taxpayer has complied with the requirements under this title to substantiate any item;

(B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; * * *

See also Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727, regarding

effective date.  Section 7491 is applicable here in that examination of the estate tax return began after July 22, 1998.

With respect to the deficiency determinations in dispute, the operative rules are contained in section 7491(a).  The estate seems to make the assertion, for the first time on reply brief, that the burden of proof as to factual issues shifts to respondent under the credible evidence proviso.  The Court, however, concludes a shift is not appropriate on this record for the reasons set forth below.

First, the Court finds that the estate has failed to introduce credible evidence with respect to the three primary matters in contention.  Credible evidence for purposes of section 7491(a) is defined as "the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)."  H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995.  As to inclusion of the annuities in the gross estate and as will be explored with greater specificity below, this matter may be decided based on a preponderance of the evidence, without regard to burden of proof.  Moreover, the estate's self-characterized credible testimony on this point is in fact nebulous and cuts both ways.  As to valuation of the annuities, the estate has offered no evidence directed toward

supporting any particular figure or amount.  Lastly, as to the disputed deduction, the broad, generalized testimony advanced lacks the probative value sought under the credible evidence standard.

Second, even where credible evidence is introduced, the taxpayer must establish, as a prerequisite to any shift under section 7491(a)(1), that the taxpayer has complied under section 7491(a)(2) with all substantiation requirements, has maintained all required records, and has cooperated with reasonable requests for witnesses, information, documents, meetings, and interviews. H. Conf. Rept. 105-599, supra at 239-240, 1998-3 C.B. at 993-994. The estate in its burden of proof argument makes no attempt to address specifically whether it has satisfied these conditions. The record also suggests that at least as to certain issues, namely valuation, it has not.  Thus, the estate has not shown compliance with section 7491(a)(2).

Third, this Court has noted in earlier cases the potential impropriety of shifting the burden under section 7491(a) where the taxpayers did not raise the issue prior to the briefing process.  E.g., Menard, Inc. v. Commissioner, T.C. Memo. 2004-207; Estate of Aronson v. Commissioner, T.C. Memo. 2003-189. The rationale for this concern rests upon the possible prejudice to the Commissioner's ability to introduce evidence specifically directed toward cooperation during the audit period.  Menard,

<u>Inc. v. Commissioner</u>, <u>supra</u>; <u>Estate of Aronson v. Commissioner</u>, <u>supra</u>.

II.  <u>Inclusion in the Gross Estate</u>

    A.  <u>General Rules</u>

As a general rule, the Code imposes a Federal excise tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  Sec. 2001(a).  The taxable estate, in turn, is defined as "the value of the gross estate", less applicable deductions.  Sec. 2051.  Section 2031(a) specifies that the gross estate comprises "all property, real or personal, tangible or intangible, wherever situated", to the extent provided in sections 2033 through 2045 (i.e., subtitle B, chapter 11, subchapter A, part III of the Code).

Section 2033 states broadly that "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death."  As alternately expressed by regulation, the gross estate encompasses all property "beneficially owned by the decedent at the time of his death."  Sec. 20.2033-1(a), Estate Tax Regs.  Sections 2034 through 2045 then explicitly mandate inclusion of several more narrowly defined classes of assets.  Among these specific sections is section 2039, which reads in pertinent part as follows:

SEC. 2039.  ANNUITIES.

    (a) General.--The gross estate shall include the value of an annuity or other payment receivable by any beneficiary by reason of surviving the decedent under any form of contract or agreement entered into after March 3, 1931 (other than as insurance under policies on the life of the decedent), if, under such contract or agreement, an annuity or other payment was payable to the decedent, or the decedent possessed the right to receive such annuity or payment, either alone or in conjunction with another for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death.

    (b) Amount Includible.--Subsection (a) shall apply to only such part of the value of the annuity or other payment receivable under such contract or agreement as is proportionate to that part of the purchase price therefor contributed by the decedent. * * *

In considering the inclusion of an annuity in the gross estate, the conflation of sections 2033 and 2039 casts a wide net.  Section 2033 and its predecessors have long been construed to reach annuities payable to a decedent's estate upon his or her death.  E.g., Millard v. Maloney, 121 F.2d 257, 259 (3d Cir. 1941); Equitable Trust Co. v. Commissioner, 31 B.T.A. 329, 333-334 (1934), revd. on another issue sub nom. Commissioner v. Chase Natl. Bank, 82 F.2d 157 (2d Cir. 1936); Arrington v. United States, 34 Fed. Cl. 144, 147-148, 150 (1995), affd. without published opinion 108 F.3d 1393 (Fed. Cir. 1997).  Section 2039 was enacted to broaden the reach of the gross estate to draw in annuities payable to surviving beneficiaries, such as joint and survivor annuities and annuities to be received by designated third persons.  Gray v. United States, 410 F.2d 1094, 1096-1097

(3d Cir. 1969); <u>Estate of Gribauskas v. Commissioner</u>, 116 T.C. 142, 149 (2001), revd. on another issue 342 F.3d 85 (2d Cir. 2003).

B. <u>Preliminary Matters</u>

1. <u>Annuities at Issue</u>

Turning to the instant case, the Court notes at the outset that the parties are in apparent concurrence that the annuities with which we are concerned, for purposes of the question of inclusion in the gross estate, are the rights to periodic payments as extant under the terms of the settlement agreement. Both parties explicitly recognize that the Allstate and Safeco annuity contracts do not control, being merely the mechanisms utilized by the payor to fund the legal obligations created by and set forth in the settlement agreement. In absence of any call for an alternative approach and cognizant that the Court of Appeals for the Federal Circuit has condoned this perspective in analogous circumstances, albeit in an unpublished opinion (cited by both parties), we proceed in a manner consistent with the parties' framework. See <u>Arrington v. United States</u>, 108 F.3d 1393 (Fed. Cir. 1997).

2. <u>Parol Evidence</u>

Given the foregoing, interpretation of the settlement agreement will be central to resolution of the parties' dispute vis-a-vis inclusion of the annuities in the gross estate. The

estate at trial sought to introduce testimony directed towards the intent of the signatories to the settlement agreement. Respondent raised a continuing objection to such testimony under the parol evidence rule. The Court reserved ruling on the matter and will now overrule respondent's objection.

Stemming from the well-established principle that State law creates legal rights and property interests while Federal law determines how the rights and interests so created shall be taxed, Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940), this Court looks to the relevant State's parol evidence rule in deciding whether to exclude extrinsic evidence concerning the rights created under a written instrument. Estate of Craft v. Commissioner, 68 T.C. 249, 263 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979). The settlement agreement here was executed in Michigan and provides in paragraph 12.0 that it is to be "construed and interpreted in accordance with the law of the State of Michigan." Hence, we look to Michigan's parol evidence rule.

Use of the parol evidence rule to ascertain the intent of the parties to a contract has long provenance in Michigan. As early stated by the Supreme Court of Michigan:

> We must look for the intent of the parties in the words used in the instrument. This court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and

unambiguous and have a definite meaning. * * * [<u>Mich. Chandelier Co. v. Morse</u>, 297 N.W. 64, 67 (Mich. 1941).]

That court has further explained that the question of whether a document is ambiguous presents a question of law, <u>Port Huron Educ. Association, MEA/NEA v. Port Huron Area Sch. Dist.</u>, 550 N.W.2d 228, 237 (Mich. 1996), and has defined an instrument as ambiguous where "its words may reasonably be understood in different ways", <u>Raska v. Farm Bureau Mut. Ins. Co.</u>, 314 N.W.2d 440, 441 (Mich. 1982).

Michigan courts have also cataloged recognized exceptions to the parol evidence rule that may operate notwithstanding a facially unambiguous document, as follows:

> "For example, the rule does not preclude admission of extrinsic evidence showing: that the writing was a sham, not intended to create legal relations; that the contract has no efficacy or effect because of fraud, illegality, or mistake; that the parties did not 'integrate' their agreement, or assent to it as the final embodiment of their understanding; or that the agreement was only 'partially integrated' because essential elements were not reduced to writing." [<u>NAG Enters., Inc. v. All State Indus., Inc.</u>, 285 N.W.2d 770, 771-772 (Mich. 1979) (quoting <u>Goodwin, Inc. v. Orson E. Coe Pontiac, Inc.</u>, 220 N.W.2d 664, 668 (Mich. 1974)); internal citations omitted.]

Consequently, for instance, the Michigan courts generally treat the issue of whether a writing is a complete and integrated agreement as a threshold inquiry to which parol evidence may be directed prior to any application of the rule. <u>Id.</u> at 771. However, an explicit merger or integration clause in the agreement will typically render this exception unavailable.

Archambo v. Lawyers Title Ins. Corp., 646 N.W.2d 170, 177 (Mich. 2002); UAW-GM Human Res. Ctr. v. KSL Recreation Corp., 579 N.W.2d 411, 418 (Mich. Ct. App. 1998).

The settlement agreement at issue here contains in paragraph 14.0 an express integration clause to the effect that "This Settlement Agreement contains the entire agreement between the Plaintiffs and the Defendants with regard to matters set forth in it". Moreover, the estate has at no time so much as raised any allegation of sham, fraud, illegality, or mistake. Accordingly, the Court concludes that none of the threshold exceptions enumerated by the Michigan courts are extant on these facts and, thus, that application of the parol evidence rule will turn on the presence or absence of ambiguity.

Respondent's primary position in this litigation is that unambiguous language of the settlement agreement afforded to decedent the sole beneficial interest in the annuities and establishes that her claims provided the sole consideration for those periodic payments. The estate counters that the terms of the agreement are susceptible to a reading under which all plaintiffs held joint beneficial interests in all payments to be made thereunder and all of their claims collectively provided the consideration for any and all relief to be paid.

While the Court rules infra that both the settlement agreement itself and the totality of the evidence in the record

speak distinctly and by a preponderance in favor of a given construction of the periodic payment provisions, the agreement does not on its face exclude the estate's construction. As an example, the attorney who represented all three plaintiffs is mentioned only in the lump-sum payment clause of paragraph 2.1. Likewise, paragraph 3.0 refers to plaintiffs and payees in the plural when discussing rights to the periodic payments. We also note that the IRS examiner who audited the estate tax return answered a question on cross-examination regarding whether there was anything in paragraph 2.2 that indicated whose claims were furnishing the consideration for the annuities: "No, there's nothing stated specifically as to which claim this applies to, it just says who it's payable to." The Court in these circumstances declines to limit the evidence considered under the parol evidence rule. Respondent's objection is overruled.

C. <u>Analysis</u>

The record in the instant case reflects that the annuities at issue here were, as of the date of decedent's death, payable to her estate. The settlement agreement provides that, in absence of designation of a beneficiary by decedent or her parents as co-conservators, the periodic payments would be made to the estate. The estate has never alleged, nor does any documentary evidence suggest, that any such designation had been

effected as of October 31, 2000, when decedent died.[4]
Furthermore, this construction of the legally determinative
settlement agreement is corroborated by the documentation
contained in the record with respect to the Allstate and Safeco
annuity contracts.  Both contracts reflect decedent's estate as
the beneficiary, and there is no evidence that any amending
change of beneficiary had been made at the time of her death.

Given the foregoing, the Court will analyze inclusion of the
annuities under the rubric of section 2033.  The critical inquiry
thus becomes whether, and to what extent, decedent held a

---

[4] The examiner who audited the estate tax return testified
at trial that the estate represented at some point that the
annuities were payable to a trust created after the date of
death.  The estate never challenged that assertion.  The estate
then, and only on reply brief, twice referenced trusts.  The
first mention is set forth below:

> While the funds were to provide care to the decedent
> during her lifetime, the ultimate disposition of those
> funds were [sic] not controlled by the decedent's
> estate, but by her parents through their powers of
> attorney.  Indeed, these powers were exercised to
> transfer the remaining annuity payments to trusts
> established by the parents, consistent with the control
> powers given to them under the Agreement.  [Emphasis
> added.]

Second, in the context of explaining why the initial probate
inventory included the value of the annuities while later
inventories did not, the estate commented that "the annuities
were never paid to or a part of decedent's probate estate, but
instead were transferred to trusts created by the parents."
These remarks, when taken in the contexts presented, support an
inference that any redirection of annuity payments to a trust or
trusts took place subsequent to decedent's death.  The estate
does not otherwise mention a trust or trusts or base any specific
argument on the existence of such an entity.

beneficial interest in the annuities at the time of her death. The record as a whole clearly manifests that decedent held at least some beneficial interest in the annuities. Decedent was one of three plaintiffs in the underlying lawsuit, injuries she suffered at the hands of the defendants were expressly detailed in the complaint, and explicit claims for judgment to redress those injuries were made by her. The settlement agreement was then entered to resolve that lawsuit, and decedent therein was named as the payee of the annuities, and only of the annuities. Decedent was also the measuring life or annuitant for both of the annuity contracts obtained to fund the settlement agreement payments, and the resultant benefit checks were made payable to her through her parents as co-conservators.

On these facts, there can be little doubt that decedent possessed at least some beneficial interest in the annuities. Moreover, even the estate does not appear seriously to contend to the contrary. Rather, the estate focuses on arguing that decedent's parents likewise held beneficial interests in the annuities. This nuance goes more properly to the question of the extent of decedent's interest for purposes of inclusion in her gross estate, not the antecedent issue of some interest includable under section 2033.

Concerning this issue of the extent of decedent's interest, the documentary record as a whole leans distinctly in the

direction of decedent alone as the intended beneficiary of the annuities. Highly probative is the structure of the settlement agreement in explicitly naming decedent's parents individually, and not decedent, as payees of the lump sum due under paragraph 2.1, then naming decedent as the sole payee of the annuities under paragraph 2.2. The Allstate and Safeco annuity contracts are again corroborative of such a construction for the reasons just mentioned above. Features to which the estate points, such as the use of plural "Plaintiffs" in paragraph 3.0 and the reference to the attorney for all three plaintiffs only in paragraph 2.1, while arguably enough to engender a degree of ambiguity, are insufficient to counteract the overall thrust of the documents.

Nor does paragraph 4.0, likewise emphasized and relied upon by the estate, suggest an opposing result. The estate contends on reply brief: "Respondent also continues to overlook the importance of the fact that the parents were given general powers of appointment over the two annuities, exercisable during their lifetimes, to direct where further annuity payments should be made in the event of Sarah's death." However, paragraph 4.0 by its terms affords the right to designate an alternate beneficiary to decedent's parents only in their capacity "as co-conservators". The very existence of this provision thus supports, rather than detracts from, the impression gleaned from

the settlement agreement that the annuity payments were intended to benefit decedent alone.

Even the inventory prepared for the Wayne County Probate Court bears a degree of corroborative value. As of February 14, 2001, decedent's parents apparently viewed the annuities as part of decedent's probate estate, representing $1,118,000 of the reported total assets of $1,535,853. The evidence further suggests that this document was in fact filed with the probate court on March 9, 2001, accompanied by payment of a $1,331.25 inventory fee. The Court takes judicial notice of the fact that the probate inventory fee imposed under Michigan law is computed based on the size of the estate and that $1,331.25 corresponds to the fee that would be due on an estate of $1,535,853. See Mich. Comp. Laws Serv. sec. 600.871 (LexisNexis 2004); see also Fed. R. Evid. 201; Estate of Reis v. Commissioner, 87 T.C. 1016, 1026-1027 (1986).

Although both parties concurred that amended inventories excluding the annuities were provided to the IRS, no such documents were proffered as evidence, nor was there any indication that a refund of some portion of the inventory fee was sought or obtained from the probate court. Rather, it is noteworthy that $1,451.25 was claimed as an administrative expense labeled Wayne County Probate Court on the Form 706 signed on July 27, 2001. This would seem to correlate with the

$1,331.25 inventory fee, along with the $100 petition or application filing fee imposed at that time under Michigan law (now $150), and some combination of minor fees or costs totaling $20. See Mich. Comp. Laws Serv. secs. 600.871, 600.880, 600.880b (LexisNexis 2004).

The estate relies principally on testimony of decedent's parents to buttress characterization of the annuities as part of a joint and unallocated settlement of all claims in the lawsuit. Mr. Davenport first testified that all claims were negotiated together in the settlement procedure and that the various claims were not broken down or discussed separately in formulating the agreement. Then, when asked to describe the reasoning behind the decision to establish the annuities,[5] he offered:

> Annuities offered some advantage that I felt for my daughter. One of our biggest fears with her was that she would outlive us. So annuity offered a benefit of a continuous stream of monies, even if we were to pass away before her.
>
> It also offered some protection in the event that myself or my wife was sued. These funds--monies, cannot be attached, and it would ensure her funds for as long as she lived, as long as she needed them.

Mr. Davenport later confirmed that his understanding upon signing the agreement was that the annuity payments under paragraph 2.2 were not just for decedent's claims alone. He also expressed his

---

[5] Mr. Davenport, by profession a financial planner, testified that he was responsible for the idea behind structuring a portion of settlement in the form of annuities from two different companies, to reduce risk.

understanding of paragraph 3.0 as follows: "Well, we understood this provision agreement that it really offered Sarah absolute protection. That there would be monies available for her, and her care, from this annuity. That there's no way anybody could cash in the annuity, and take proceeds from her."

Ms. Weiss-Davenport, like her husband, testified that she viewed the lawsuit as comprising a single claim for the three plaintiffs and was never privy to any breakdown of pain, suffering, or medical problems for her daughter separately. When asked to describe her role in connection with the annuity amounts, Ms. Weiss-Davenport stated:

> Well, I think that one of my biggest roles was just Rick and I having the discussion about why we should do it this way, how they work, because I, obviously, do not have a background in finance, and how this would benefit, in the long run, Sarah, to have two separate payments coming in, from two different companies, in case, as Rick said, one of the companies were to go under.

> We wanted it set up this way so that in the event that Rick and I were to become deceased, or, for example, one of us left the marriage and there was a new person coming on board, we wanted to make sure that Sarah's share would be kept up.

> And that's why we set it up this way: for her safety. Because as Rick said, our biggest fear was that what would happen to her if she outlived us. And at the time we had no other children to consider helping to take care of her.

Thus, the Court has before it a situation where on the one hand decedent's parents affirmed, primarily in response to leading questions on direct examination, that they understood all

payments under the agreement as representing a unitary and unallocated resolution of all claims raised in the lawsuit. On the other hand, when Mr. Davenport and Ms. Weiss-Davenport explained in detail the reasoning underlying the annuity provisions, every remark connects these payments to decedent's "benefit", "absolute protection", "care", "share", "safety", what "she needed". Hence, as alluded to previously, the testimony upon which the estate places such great reliance in fact cuts both ways. Overall and at first blush, it patently corroborates that decedent at a minimum possessed some beneficial interest in the annuities, as required for inclusion under section 2033. However, when scrutinized closely, the more detailed, heartfelt, and therefore credible testimony goes even further, weighing heavily towards a beneficial interest held by decedent alone.

Not once did either of decedent's parents reference any manner in which they personally and individually would benefit from the annuity payments under paragraph 2.2 of the settlement agreement. Moreover, in discussing paragraph 3.0, they both chose to emphasize how they felt bound thereby from effecting any change in or control over the payment streams. Only in response to further questions directed to paragraph 4.0 did decedent's parents make comments that reverted to the idea of some degree of control over the annuities. As previously mentioned, however,

the rights afforded by paragraph 4.0 inured to decedent's parents only as her "co-conservators".

The Court would also make a final observation in connection with the testimonial record. It is well settled that when a settlement agreement fails to designate the reason for a payment, the intent of the payor in making the payment controls for tax purposes. See, e.g., Francisco v. United States, 267 F.3d 303, 319 (3d Cir. 2001); Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Metzger v. Commissioner, 88 T.C. 834, 847-848 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); Reisman v. Commissioner, T.C. Memo. 2000-173, affd. 3 Fed. Appx. 374 (6th Cir. 2001). Yet the estate did not call as a witness any of the defendants in the underlying lawsuit. Suffice it to say that the silence of the record in this regard speaks loudly. See, e.g., Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

In support of their respective positions, both sides rely primarily on a single case. The estate analogizes from Kegel v. State, 830 P.2d 563 (N.M. Ct. App. 1992), while respondent draws our attention to Arrington v. United States, 34 Fed. Cl. 144 (1995). Kegel v. State, supra at 564, involved a settlement agreement resulting from a malpractice lawsuit brought by a disabled minor child and his parents. The settlement agreement

provided for a "'trust fund to be established in * * * [the child's] behalf'". Id. During the settlement process, a number of checks were issued, payable to various combinations of the child, his conservator, and his parents, and an annuity was assigned to the child, through his conservator, and to his parents, "individually". Id. The annuity and portions of the lump-sum payments were placed in the trust. Id.

The question before the court was whether the trust was a "Medicaid qualifying trust" under 42 U.S.C. sec. 1396a(k)(2) (1988), such that the trust estate would be deemed "available" to the child and would eliminate his eligibility for health care benefits from the State. Id. As pertinent there, the trust would meet the statutory definition of qualifying only if the child were considered to have established or created the trust. Id. at 565-566. On the facts presented, the court in Kegel v. State, supra at 567-568 concluded:

> There is nothing in the record to support a finding or conclusion that * * * [the child] or his conservator was entitled to any particular portion of the proceeds. The record indicates that his parents and the conservator acted jointly in deciding upon a trust as a vehicle for managing the funds they anticipated as a result of the settlement. To the extent the parents funded the trust with their share of the settlement proceeds, the Department appears to concede that the trust was not a Medicaid qualifying trust. * * *
>
> * * * * * * *
>
> The creation of this trust involved multiple grantors. * * * [The child] never had unrestricted

> legal or equitable title to the additional sums made available, and he himself played no role in the decision to create the trust. We conclude that there is too little in this record to support a determination that * * * [the child] was the grantor of the trust in this case.

As can be gleaned from the foregoing recitation, Kegel v. State, supra, is both legally and factually distinguishable from the case at bar. From a legal standpoint, that case was concerned with a technical exegesis of a narrow statutory definition having no particular analogue in the Federal estate tax regime. Critically, the question of whether a person is the creator or grantor of a trust is distinctly different from the question of whether someone had a beneficial interest in a trust or other property. From a factual standpoint, the documentary record in Kegel v. State, supra, showed extensive commingling of interests and did not favor any particular separation or allocation. In contrast and for the reasons cataloged above, the record here does, on balance, weigh distinctly in favor of decedent as the sole intended beneficiary of the annuities.

Arrington v. United States, supra, offers stronger parallels. That case, too, dealt with settlement of a lawsuit brought by parents individually and on behalf of a minor son who had sustained injuries at birth. Id. at 145-146. The pertinent settlement agreement provided, inter alia, for an annuity "'for the sole use and benefit of'" the child, guaranteed for 360 months, and payable to the child's estate in the event of his

death.  Id.  The annuity was funded through purchase of a contract policy listing the initial payee as "'Wilford Arrington and Deborah Arrington, as Parents and Next Friends of William Arrington, for the sole use and benefit of William Arrington,'" and listing the contingent payee as the child's estate.  Id. at 146.  The court held that the child was the sole beneficial owner of the annuity, such that its value was includable in his gross estate under section 2033.  Id. at 147-148, 150.

The estate maintains that Arrington v. United States, supra, is distinguishable on its facts largely because the annuity payments there, unlike here, were directly traceable to the child's claims and because here, unlike there, decedent's parents were granted control to direct the payments to other than decedent's estate.  As to the former, although the language of the settlement agreement in Arrington v. United States, supra, may have been more explicit in naming the child as the beneficiary of the annuity, we find the overall structure of the settlement agreement here to be equally persuasive.  Notably, the agreement in Arrington v. United States, supra, would appear to have earmarked no compensation for the child's parents, while here decedent's parents were designated as the payees of specific sums.  As to the latter complaint, we refer again to the fact that the alleged control of decedent's parents by its terms

existed only in a fiduciary capacity and therefore does not limit or weaken decedent's interest in the annuities.

To recapitulate, the Court is satisfied that decedent should be characterized as the sole beneficial owner of the annuities, such that the value thereof in includable in her gross estate under section 2033. Consequently, we need not reach the question of whether the annuities would likewise be properly included under section 2039. Nonetheless, our affirmative answer on the question of inclusion does necessitate examination of the issue of valuation, to which we now turn.

III. Valuation of the Annuities

A. General Rules

With respect to an interest included in the gross estate pursuant to section 2033 and/or following provisions, the general rule governing valuation is set forth in section 20.2031-1(b), Estate Tax Regs.:

> The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 [now 2045 due to addition and renumbering] is its fair market value at the time of the decedent's death, except that if the executor elects the alternate valuation method under section 2032, it is the fair market value thereof at the date, and with the adjustments, prescribed in that section. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. * * *

However, section 7520, enacted as part of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 5031(a), 102 Stat. 3668, provides a specific rule for valuing enumerated forms of property interests, as follows:

SEC. 7520.  VALUATION TABLES.

> (a) General Rule.--For purposes of this title, the value of any annuity, any interest for life or a term of years, or any remainder or reversionary interest shall be determined--
>
> > (1) under tables prescribed by the Secretary, and
>
> > (2) by using an interest rate (rounded to the nearest 2/10ths of 1 percent) equal to 120 percent of the Federal midterm rate in effect under section 1274(d)(1) for the month in which the valuation date falls.
>
> \*    \*    \*    \*    \*    \*    \*
>
> (b) Section Not To Apply for Certain Purposes.-- This section shall not apply for purposes of part I of subchapter D of chapter 1 [relating to qualified plans and deferred compensation] or any other provision specified in regulations.

For estate tax purposes, regulations promulgated under section 7520 direct that the relevant actuarial tables for valuing interests covered by the statute are contained in section 20.2031-7, Estate Tax Regs.  Sec. 20.7520-1(a)(1), Estate Tax Regs.; see also sec. 20.2031-7(d)(5), Example (4), Estate Tax Regs. (illustrating the calculation for valuing an annuity of $10,000 per year payable to a decedent or the decedent's estate). The regulations under section 7520 also delineate exceptions to

the application of that section.  Sec. 20.7520-3, Estate Tax Regs.  The estate has raised none of these exceptions, and they will not be further addressed.

Section 20.2031-7, Estate Tax Regs., entitled "Valuation of annuities, interests for life or term of years, and remainder or reversionary interests", reads in part:

> (a) In general.--Except as otherwise provided in paragraph (b) of this section and sec. 20.7520-3(b) (pertaining to certain limitations on the use of prescribed tables), the fair market value of annuities, life estates, terms of years, remainders, and reversionary interests for estates of decedents is the present value of such interests, determined under paragraph (d) of this section.  The regulations in this and in related sections provide tables with standard actuarial factors and examples that illustrate how to use the tables to compute the present value of ordinary annuity, life, and remainder interests in property. These sections also refer to standard and special actuarial factors that may be necessary to compute the present value of similar interests in more unusual fact situations.
>
> (b) Commercial annuities and insurance contracts.--The value of annuities issued by companies regularly engaged in their sale, and of insurance policies on the lives of persons other than the decedent, is determined under sec. 20.2031-8. * * *

The referenced section 20.2031-8, Estate Tax Regs., then states, as relevant here:  "The value of a contract for the payment of an annuity, or an insurance policy on the life of a person other than the decedent, issued by a company regularly engaged in the selling of contracts of that character is established through the sale by that company of comparable contracts."  Sec. 20.2031-8(a)(1), Estate Tax Regs.

B.  Analysis

In the present matter, respondent determined the value of the annuities includable in the gross estate utilizing the tables and interest rates prescribed under section 7520 and set forth in section 20.2031-7(d), Estate Tax Regs.  Those computations have not been made a part of the record, and the estate has never disputed that the calculations reflect a correct application of the section 7520 actuarial methodology and attendant tables. Rather, the estate advocates use of section 20.2031-8, Estate Tax Regs., contending for valuation "on the basis of the cost of commercial replacement annuities as of decedent's date of death". The estate's argument on this point is limited to a few sentences, the substance of which is contained in the following: "Petitioner takes the position that commercial annuities were purchased in connection with the settlement arrangement. Therefore, the proper method for valuation of such annuities would be comparable commercial contracts as of the Decedent's date of death, the method of valuation specified under Treas. Reg. 20:2031-8."

There exist, however several difficulties with the estate's position.  First, as previously noted, the legally determinative document conferring on decedent the right to streams of periodic payments is the settlement agreement.  That right is to periodic payments from the hospital, not from a commercial annuity

provider. Again, the annuity contracts function only as the chosen method of funding the legal rights created under the settlement agreement, and such choice should not affect the value of the independently operative legal entitlement.

A second, more practical problem arises in that the estate has at no time offered any evidence whatsoever regarding the value of comparable commercial contracts. The only figure contained in the record other than that determined by respondent in the notice of deficiency is the $1,118,000 listed on the probate inventory. The estate has never mentioned how the inventory amount was derived or suggested that it would equate with the cost of a commercial contract. Accordingly, even if the Court were to accept the estate's position that the annuities should be valued under section 20.2031-8, Estate Tax Regs., the estate has failed to show that such value would in fact differ from the amount determined by respondent under section 20.2031-7, Estate Tax Regs. The Court is thus constrained to uphold respondent's $1,514,572 valuation.

IV. Deduction for Funeral Luncheon

Section 2053(a)(1) provides for a deduction from the gross estate for such funeral expenses as are allowed by the laws of the jurisdiction under which the estate is being administered. Michigan law allows reasonable funeral and burial expenses as a

charge against the estate.  See Mich. Comp. Laws Ann. Serv. 700.1103(g), 700.3805(1)(b) (LexisNexis 2005).

On Form 706, the estate claimed total funeral expenses of $7,796.38, broken down and described therein as follows:

| Description | Amount |
|---|---|
| A.H. Peters Funeral Home | $2,475.20 |
| Cremation | 105.00 |
| Soloist | 150.00 |
| Priest | 250.00 |
| Organist | 150.00 |
| Obituary notice | 316.84 |
| Cemetery (niche for urn) | 250.00 |
| Funeral luncheon | 3,638.92 |
| Various related expenses (holy picture cards, acknowledgments, postage) | 460.42 |

Respondent allowed all of the expenses claimed with the exception of the $3,639 (rounded) designated for the funeral luncheon.  The estate alleges that the cost of the luncheon is properly deductible under section 2053(a)(1).

Regulations promulgated under section 2053(a)(1) offer only limited guidance.  Although neither the statute itself nor the regulations define "funeral expenses", section 20.2053-2, Estate Tax Regs., highlights "A reasonable expenditure for a tombstone, monument, or mausoleum, or for a burial lot, either for the decedent or his family, including a reasonable expenditure for its future care" and "the cost of transportation of the person bringing the body to the place of burial" as examples of deductible costs.  Caselaw interpreting the term has in turn

provided the following touchstone: "The basis of this deduction is the necessity of the expense in connection with the decedent's funeral." Estate of Berkman v. Commissioner, T.C. Memo. 1979-46; see also Estate of Tuck v. Commissioner, T.C. Memo. 1988-560 ("As we interpret the term 'funeral expenses', it means expenses incurred in connection with the decedent's funeral.").

The record contains no documentary evidence with respect to the claimed funeral luncheon expense. At trial, decedent's parents provided the information set forth below. Mr. Davenport testified in a colloquy with counsel:

> Q    Now I'd like to draw your attention to Sarah's funeral. In connection with the funeral, was there a reception after the funeral?
>
> A    Yes, there was.
>
> Q    And what was the purpose of that reception?
>
> A    In large part it was to say, Thank you to a lot of people in our family, teachers, other healthcare professionals that worked with us and Sarah over the years.
>
> Q    And were these individuals invited to the funeral?
>
> A    Yes, they were.
>
> Q    And these were people that had rendered care to her. Did she require a great deal of care?
>
> A    Yes, she did.

Ms. Weiss-Davenport was similarly asked what she "felt the purpose of that reception was", and she responded:

As Rick said, during Sarah's life--she lived 12 years--she was very, very complex with her care.  We had a multitude of people throughout the years who fell in love with her.  People who we didn't even know until, you know, later on.

Even after she died, people came to us saying, you know, what a wonderful little girl she was.  And we wanted to show gratitude towards those people.

The church that we belong to went way out, and really helped us out during this terrible time.

She had therapist, teachers, just friends, and we wanted to just show gratitude towards them, and have the luncheon.

And to be honest with you, we had to hold it in a place that was large enough, because the church hall, the reception hall, was unable to handle the volume of people that showed up for the funeral.  So.

On reply brief, the estate then summarizes its position regarding this item, maintaining "that the funeral reception expense incurred on the day of decedent's funeral, because of decedent's unique medical circumstances and the support and assistance she received during her short lifetime is an expense intimately tied to decedent's funeral arrangements and is deductible for federal estate tax purposes."

Unfortunately, while we applaud the spirit of gratitude and generosity that apparently animated the decision to sponsor the funeral luncheon, the record before us is simply inadequate to establish the event's deductibility.  First, as a practical matter, both Michigan State law and the Federal regulations suggest a standard of reasonableness in examining the amount of

funeral expenditures.  Because the record here offers nothing but the total line-item figure of $3,638.92, we lack any basis whatsoever for determining reasonableness.  We do not know whether that amount comprises charges for the venue, decorating, catering, entertainment, or a combination of supplies and services.  We do not know who received the claimed payment or payments.

Second, the record is likewise insufficient to establish the requisite necessity in connection with decedent's funeral.  From the testimony at trial, it is to be inferred that the focus of the luncheon was on recognizing and thanking third parties for their support both during decedent's life and after her passing. That represents a shift from the traditional focus of a funeral in eulogizing and laying to rest the deceased.  The evidence, consisting only of broad and generalized statements about the intent of the luncheon, deprives the Court of any ability to compare what may in fact have transpired there with activities typically associated with funeral services.

In addition, the testimony suggests that the reception was held at a different location than the funeral service itself, as according to Ms. Weiss-Davenport, the guests in attendance were so numerous that "the church hall, the reception hall, was unable to handle the volume of people that showed up for the funeral". Similarly, the extent of the overlap in attendance is unclear.

Although Mr. Davenport testified that those who attended the reception were invited to the funeral, did some individuals attend only one or the other?  Suffice it to say that the Court is constrained to hold for respondent on this issue as well.

In closing, the Court has considered all of the parties' contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, irrelevant, or moot.  To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.